

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 MAY 20 AM 11: 19

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 66876-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| MARY DAWN PETERSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 20, 2013 |

SCHINDLER, J. — To convict a person of animal cruelty in the first degree, the State must prove beyond a reasonable doubt that acting with criminal negligence, the defendant starves, dehydrates, or suffocates an animal resulting in substantial and unjustifiable physical pain extending over a period of time sufficient to cause considerable suffering or death. Mary Dawn Peterson appeals her conviction of six counts of animal cruelty in the first degree. Peterson asserts that as applied, the first degree animal cruelty statute is unconstitutionally vague. Peterson also contends starvation and dehydration of an animal are alternative means of committing the crime and substantial evidence does not support the alternative means of dehydration. Peterson further contends the court did not have authority to order her to reimburse Snohomish County for the costs incurred in caring for the horses. We hold that as applied, the first degree animal cruelty statute is not void for vagueness. We also hold

that starvation and dehydration are alternative means of committing the crime of animal cruelty in the first degree, but sufficient evidence supports the alternative means of dehydration, and the court had authority to require Peterson to pay for the costs of caring for the animals under RCW 16.52.200(6). Accordingly, we affirm.

## FACTS

In 2005, Mary Dawn Peterson and her spouse Ryan Peterson moved to the United States from Canada and started a horse boarding business in Sultan. In early 2009, Peterson owned four horses and decided to start a business breeding racehorses. In March 2009, Peterson purchased two brood mares. In April, she acquired a 10-year-old thoroughbred mare named Tyme. Peterson also acquired another horse and her foal.

Tyme suffered from chronic laminitis, a painful foot condition. The previous owners provided Peterson with a July 2008 letter from a veterinarian stating that Tyme is "overall in good health, her laminitis is being well-managed, she walks quite comfortably, and she seems happy."

Peterson asked her farrier Douglas Serjeant to examine Tyme. Serjeant testified a farrier gives advice about the health of a horse because "the feet tell you how sick the animal is and when it's getting sick." Serjeant told Peterson "we can fix" Tyme and suggested taking Tyme off all medications and giving the horse hay, barley, and sea salt.

Peterson kept the horses at a boarding facility in Sultan. When the owners decided to stop boarding horses, Peterson started looking for property to lease.

2

Borchardt Property: April to June 2009

In April 2009, Peterson rented a 3.5- to 4-acre field in Sultan from Rock Borchardt. Borchardt lived nearby and told Peterson he did not want any responsibility for "feeding [the horses], watering them or anything." Borchardt told Peterson that "four [horses] worked fine, because if you moved them around, you wouldn't run out of grass."

Horses consume two to three percent of their ideal body weight per day. A horse with an ideal weight of 1,100 pounds requires approximately 22 to 33 pounds of hay per day. Thoroughbreds often require more food, sometimes two-thirds of a bale of hay, or six to 10 flakes a day. A flake is about four or five pounds of hay.

The amount of food a horse needs also depends on the quality and nutritional value of the food. Local grass hay grown in Western Washington has less protein and is considered to be lower quality. Higher quality hay is grown in Eastern Washington. Because of the lower nutritional and caloric value, when a horse is fed exclusively local grass hay from Western Washington, owners often double the amount of hay. Owners also often feed their horses alfalfa, which has a higher nutritional value. An average horse requires six to 10 gallons of water a day.

Borchardt said that within the first couple weeks, the horses ate the grass down to the dirt, and he called Peterson to tell her there was no food for the horses. Borchardt testified that he only saw Peterson come to the property two or three times to feed the horses small amounts of hay.

By June, Peterson was keeping 12 horses on the property. Borchardt testified that he frequently called Peterson expressing concern about the lack of food and water

for the horses. Borchardt said he "got extremely upset" when he saw 10 horses standing near "the watering dish" on a 100-degree day and the dish was "bone dry." Borchardt gave the horses water and immediately called Peterson to tell her that she "need[ed] to take care of [her] horses and feed and water regularly."

Borchardt testified that he had to refill the water trough "more than just one time" and called "numerous times" to tell Peterson she needed to fill the trough and give the horses water. Peterson told Borchardt that the horses "didn't need that much water because they got most of their water through grass." Because he was so "upset about the way the horses were taken care of," Borchardt told Peterson she had to "come take care of your horses or get them off my property."

Trout Farm Road Property: June to September 2009

At the end of May, Peterson leased approximately 2.5 acres of property located on Trout Farm Road near Sultan. Peterson used electric fencing to create different enclosures for the horses. In early June, one of the brood mares gave birth to a foal, and Peterson acquired another "orphan" foal.

Janet Auckland could see the property Peterson rented from her house on Trout Farm Road. Auckland testified that at first, Peterson kept five or six horses on the property. Auckland said that within a week, the tall grass on the property was gone, leaving nothing but dirt, and "[t]here wasn't anything for them to survive on, nothing." Auckland testified that when she returned from vacation on July 5, there were 12 to 13 horses on the property, quite a few "were very skinny," and the mare named Tyme was barely moving and had no food or water.

> Quite a few of them, their ribs and their bones are showing. . . . There was a mare that-- She would go-- She would be up walking around, barely

4

> moving for maybe two or three days. And then she'd lay down, and she would be down for four days. And so I would get out my binoculars to see what was going on over there. And I never saw [Peterson] feed the horse. I never seen any water given to the horse. And the horse didn't get up.
>     And then just by probably pure thirst, she would get up and get herself to a bucket about that big around, about that deep (indicating), and look for water. And there was usually no-- I never saw her drink anything out of there.

Auckland testified that the horses had no shelter from the heat and during the month of July, the temperature often reached 108 degrees. Auckland testified that Peterson did not use a trough for water but "a little bucket, . . . not even a five-gallon bucket." Auckland said that during the summer, a man named "Nick" would "show up about every two weeks" and that another man filled a bucket with about "30 seconds of water" every two days.

Auckland said that a stallion received good care, getting alfalfa and water, but that the other horses would get "maybe" a flake or two of hay each day and not enough water.

> I did notice that there's a solid wood fence, and it was back-- And it was back by some trees that line-- That her-- That the property was lined. And she kept a stud back there. And she would take very good care of him. He got alfalfa, and he got fed water. She gave him good attention.
>     But the other horses that were out in the other parts of the field, they were lucky if-- I observed them only getting maybe-- 12 or 13 of the horses would only get maybe a flake or two of hay, and they were all-- The all had to try and survive on that.

Auckland also testified about a horse Peterson kept in a metal pen near the road. Auckland said that during the eight or nine days the horse was in the pen, "I never saw water or food given to her during the day. And when it was hot, there's no shelter. There was nothing for this horse to get out of the heat. And it would just pace around in that-- That corral."

5

Snohomish County Animal Control received several complaints from an animal welfare organization and neighbors about the condition of the horses at the Trout Farm Road property. On June 24, Snohomish County Senior Animal Control Officer Paul Delgado went to the Trout Farm Road property. Officer Delgado said there were 11 horses on the property. Officer Delgado was concerned about the condition of the horses, and saw only one and one-half bales of alfalfa on the property.

> After I got to see what was going on here, I looked at the other animals on the property. There were two other-- Approximately two other horses that had me concerned, because they were not yet to this degree [of poor physical condition] but they were a little similar. I automatically started looking to see if there was feed on the property. I saw-- I counted like a bale and a half of alfalfa.

Officer Delgado was very concerned about three of the horses, "but the one that really grabbed my attention and concern" was Tyme. Officer Delgado testified that Tyme's bones were prominent and protruding, there were abrasions on the mare's side and back, she limped badly, and there was a large football-sized mass between her front legs. Officer Delgado posted a notice on the empty trailer located on the property asking Peterson to contact him.

Peterson called Officer Delgado the next day. Officer Delgado told Peterson he was concerned about some of the horses on the property and, in particular, the horse named Tyme. Peterson told Officer Delgado that "she was a reputable breeder, well-known in the area and in the horse community." Peterson said Tyme was a racehorse with "an outstanding pedigree," and a veterinarian had examined Tyme before she acquired the horse. Officer Delgado told Peterson that a veterinarian needed to examine Tyme and she needed to follow the veterinarian's instructions. Officer Delgado also told Peterson that he would be checking on food and water for the horses.

Officer Delgado returned to the property several times during the next two weeks. On July 10, a neighbor called to report the horses did not have water. When Officer Delgado arrived, a maintenance person was fixing a broken water pump, but Peterson was not there. When Officer Delgado started to fill the trough with water, five horses immediately ran to the trough and tried to drink the water as he was filling the trough. Officer Delgado called Peterson and reiterated the importance of providing the horses with food and water. Officer Delgado warned Peterson that if she did not address the problem, she could face criminal charges. Officer Delgado also reiterated that a veterinarian had to examine Tyme by July 14.

Peterson contacted Dr. Jennifer Miller, a veterinarian at Pilchuck Veterinary Hospital, to examine Tyme. Dr. Miller said that Tyme was "[s]everely underweight [and] had this big sac, kind of a seroma, and there was a wound on the bottom that seemed to be draining." Dr. Miller said that in addition to severe laminitis, Tyme also had founder, a painful hoof condition.

> A    . . . She also had sores, which you can see one on her hip, but basically on the bony prominences from being down so much. She just had sores from lying there.
> Q    Okay. So overall, what was your diagnosis, if you will, of Tyme?
> A    She was emaciated, and she had severe chronic founder.

Using the Henneke scale, Dr. Miller scored Tyme's body condition as 1.5. The Henneke score is based on how much fat there is on the horse's body. A score of 1 on the Henneke scale indicates an emaciated animal with the outline of its bones visible, like a "walking skeleton." A score of 9 indicates a severely obese horse. A score of 4 to 6 is ideal. Dr. Miller told Peterson and Officer Delgado that she recommended the "mare be euthanized."

7

At the request of Dr. Miller, another veterinarian went to the Trout Farm Road property on July 15 to examine Tyme and determine whether the horse should be euthanized. Officer Delgado, his supervisor Lieutenant Gordon Abbott, and Peterson were present when Dr. Brandi Holohan examined Tyme. Dr. Holohan said that Tyme's demeanor was dull and her "physical appearance was very dramatic. She was in very poor body condition," her ribs were "very discernible," and it was "obvious that she had been nonambulatory." Dr. Holohan testified that Tyme had sores on all bony prominences and a large, draining wound on her chest with flies crawling in and out of the wound.

Dr. Holohan said Tyme had no shelter and no food.

I didn't see that she had-- I don't recall specifically where her water source was. There was no food other than a few very coarse stems on the ground. As I recall, for her there was no grass in the paddock at all. It was all dirt.

Dr. Holohan scored Tyme as a 1.5 on the Henneke scale and recommended euthanizing the mare. Peterson disagreed with Dr. Holohan's recommendation. Peterson wanted to breed Tyme. Dr. Holohan explained that Tyme could not carry a foal to term, and Peterson eventually agreed to euthanize Tyme. An autopsy showed that Tyme was so emaciated that the mare had no subcutaneous fat. An ideal weight would have been 1,100 to 1,200 pounds, but Tyme weighed just 872 pounds.

In mid-July, Officer Delgado rotated to a different assignment and Officer Angela Davis assumed responsibility for his case load. Officer Davis told Peterson that she was very concerned about "the overall welfare of the remaining horses on the property, since most of them were thin; several were emaciated." Officer Davis recommended feeding the horses high quality hay, and said she would return "to check on the status of

8

those horses." Officer Davis said that Peterson "seemed to be aware of what needed to be done."

Officer Davis returned to the property several times in July, and continued to have concerns about the care of the horses. On July 20, Officer Davis saw only one bale of alfalfa hay for the 16 horses on the property. On July 27, Officer Davis saw only two bales of local grass hay. Officer Davis said it was close to 100 degrees that day and some of the horses had only an inch of water "remaining at the bottom of the trough." When Officer Davis returned the next day, there were 18 horses on the property and "it did not appear that any of the horses had hay in their fields with them at the time. And . . . one horse was eating manure."

Officer Davis went to the Trout Farm Road property to check on the welfare of the horses a number of times during the month of August. Officer Davis said that the condition of the horses was getting worse. The brood mares had lost substantial weight and some of the other horses were emaciated. Officer Davis testified that on "each visit that I was out there contacting Mary, I tried to re-emphasize to her that the horses were still thin and that we needed to continue to see improvement." Officer Davis said Peterson "act[ed] like she agreed with me." On one occasion, Officer Davis asked Nicholas Osborne to tell Peterson that the condition of the horses was "critical."

When Officer Davis went to the property on August 27, the horses in one of the enclosures did not have any water. Officer Davis testified that when she filled the water trough, the horses immediately came running. Later that day, Officer Davis responded to a neighbor's complaint and returned to the property to find several other horses

without water. Officer Davis said the trough was dry and there was no hay in the paddocks.

Auckland testified that she also called the Snohomish County Sheriff's Office in August after one of the mares was injured. Auckland told the Snohomish County Sherriff's Office no one was around, Peterson had not been to the property for at least three days, and one of the mares got her hoof stuck in a bucket and was injured.

On August 25 and 27, Officer Davis took photographs of the horses.[1] One of the photographs shows an emaciated bay brood mare with visible hip bones, vertebrae, and ribs. Another photograph shows the bay colt has visible ribs, a dip in his neckline indicating he was getting thin, and his legs were too thin with insufficient muscle. Other photographs show the protruding ribs, vertebrae, and hip bones on a light bay mare and a bay mare with a star.

Seizure of Horses

On September 9, 2009, Snohomish County Animal Control officers and the Snohomish County Sherriff's Office executed a search warrant to seize the horses. Veterinarian Dr. Daniel Haskins examined the horses and determined 10 of the 18 horses were in critical condition. Five of the horses in critical condition were kept in a pasture, later designated as "Enclosure C." The horses in Enclosure C were an orphan bay filly, a thoroughbred bay mare with a foal, and two bay mares, one with a white star marking.

Dr. Haskins scored the orphan bay filly as a 2 on the Henneke scale. Dr. Haskins said that the orphan filly was undersized for her age, and her coat was full of

---

[1] The horses have names but were referred to by numbers throughout the State's case and in the information.

lice. The vertebrae on the filly were very prominent underneath the skin and the top line of the horse was not as full as it should have been. Dr. Haskins scored the bay mare with the foal as a 2. The bay mare's hip bones were sticking out, and the horse had the potbellied appearance of a malnourished horse. Dr. Haskins scored the colt, the light bay mare, and the bay mare with the star as 2.5.

After the seizure, Snohomish County Animal Control paid the costs of boarding, feeding, and rehabilitating the horses at a private boarding facility. Dr. Haskins examined the horses that were seized five weeks later, and again in December. By December, the horses had greatly improved, and the horses were all eventually adopted.

The State charged Peterson with animal cruelty in the first degree of six horses: the orphan bay filly, designated as Horse 1; a thoroughbred bay mare, Horse 3; the bay mare's colt, Horse 4; a light bay mare, Horse 6; the bay mare with a star, Horse 8; and Tyme. The information alleged that from April 12 to July 15, 2009, Peterson starved or dehydrated Tyme causing substantial and unjustifiable pain that extended for a period sufficient to cause considerable suffering and death. The information further alleged that from June 1 to September 9, 2009, Peterson negligently starved or dehydrated the other five horses causing substantial and unjustifiable pain that extended for a period sufficient to cause considerable suffering.

Jury Trial

The jury trial lasted six days. The State called a number of witnesses, including Snohomish County Animal Control Officer Delgado and Officer Davis, Borchardt, Auckland, Dr. Miller, Dr. Holohan, Dr. Haskins, and a woman who boarded her horse

11

with Peterson during the summer of 2009, Vanessa Smith. The court also admitted into evidence videotapes of the horses taken during the summer of 2009, the photographs of the horses taken on August 25 and 27, and a number of photographs taken on the day of the seizure and after the horses were at the boarding facility.

Dr. Miller testified that Tyme was malnourished and the lack of food would have been physically painful, but could not say to a "reasonable degree of medical certainty" that Tyme experienced pain from starvation or dehydration. Dr. Miller testified that some of the other horses on the property were underweight and not healthy, and "didn't seem to be getting enough food."

Dr. Holohan testified that Tyme was suffering and in severe pain from starvation. Dr. Holohan also testified that "all of the herd was in some state of poor body condition."

> It was very obvious to me that there was no manure really present in any of the paddocks, because I observed several horses, as manure was passed by one horse, it was eaten by the next horse. . . . Horses are designed to graze 21, 20, 21 hours out of the day. We care for horses where we offer them food so they can do some eating behavior multiple hours a day. They will search out anything to be able to try and apprehend food, whether it's chew on trees, sort through the dust to find anything that resembles plant material. And if the only thing that resembles plant material is manure, then I would-- You know, I witnessed first hand [sic] that what they will do is they will eat manure to try to find something to eat.

Dr. Haskins testified at length. Dr. Haskins testified that a horse with a low Henneke score first burns through fat and then starts burning through muscle. According to Dr. Haskins, if a horse is not fed and there is no pasture, in a couple months the horse could go from an ideal weight to a Henneke score of 2. Dr. Haskins testified that in his 33 years as a veterinarian, the quality of the feed at the Trout Farm

Road property was "absolutely the poorest I have ever seen on any of these cases I've been involved with or other farms that I visit on a regular basis."

Dr. Haskins said that the enclosures contained a lot of mud and manure with moldy hay strewn over the ground, and "[t]here wasn't one blade, one square foot of area that was not churned into mud" in Enclosure C. Dr. Haskins testified that waste intermingled with food can cause an increased "parasite load" that deprives a horse of nutrients. Dr. Haskins also said the horses had no salt or mineral blocks, a critical electrolyte requirement. Dr. Haskins testified that lack of salt or mineral blocks contributes to dehydration. While the blood work for three of the horses did not indicate dehydration, Dr. Haskins said that anemia can make dehydration difficult to detect.

Dr. Haskins testified that feeding a horse intermittently can cause pain.

> [A] horse normally is going to be grazing, in natural conditions, 20 out of 24 hours, so they have constantly something in the stomach. A horse that is only fed once a day, its acid levels in the stomach will rise. And that's a scientific fact.

Dr. Haskins also testified that the overall demeanor, head carriage, and dull affect of the horses indicated the horses were suffering. Dr. Haskins said the horses appeared "dull, depressed," and uninterested. Dr. Haskins testified that a "dull presentation" is medically significant, and this "sad aspect . . . would be the equivalent of a suffering [horse], the head down, the dull eyes, the ears down, just general lackadaisical nature." According to Dr. Haskins, "[M]y conclusion was and is that these horses were suffering and were in actual physical pain due to the extreme conditions that they were subjected to."

Dr. Haskins said that after being cared for by a boarding facility, four of the horses had improved by October 14 to the 4 to 5 range on the Henneke scale. One

horse was still a 2, but that horse was nursing a foal. By the beginning of December, the horses had significantly improved.

Vanessa Smith testified that Peterson boarded one of her horses from April to September 2009. Smith said that the horse was in "very good condition" in April. But when Smith retrieved her horse in September, the horse was "extremely thin." Smith said that the horse had "no muscle at all" and she could see the horse's backbone, hip bones, and "could count every rib." Smith testified that the horse was anxious and food aggressive, and it took six months for the horse to return to a normal weight.

The defense called veterinarian Dr. Paul Mabrey, Nicholas Osborne, and Peterson's farrier Douglas Serjeant to testify. Osborne testified that he worked for Peterson at the Trout Farm Road property beginning in June or July of 2009. Osborne said he installed fences and cleared rocks from the paddocks. Osborne testified that when he was at the property, he would feed and water the horses. According to Osborne, the animal control officers were "showing up because the neighbor kept calling Animal Control and the police." Osborne said that when he told Peterson that Officer Davis said the "horses needed more weight," Peterson admitted that she "knew that the horses needed more weight."

Dr. Mabrey testified that "scientific methods and behavioral precepts known to veterinarians and animal husbandry professionals permit objective determination of animal pain, distress and suffering." Dr. Mabrey testified that starvation can be detected by testing blood and urine, and that dehydration can be detected by blood test or by pinching the skin of the animal. Based on his review of the medical records,

videotapes, and photographs, Dr. Mabrey testified that on a more likely than not basis, none of the horses were in a state of starvation or dehydration.

Peterson testified. Peterson denied starving or dehydrating the horses. Peterson also denied that the horses were in pain. Peterson claimed that she regularly fed and watered the horses. Peterson said she consulted with her farrier about Tyme and he recommended taking the horse off all medications, including the pain medication phenylbutazone. Peterson said that in the beginning of July, she "upped their feed" for the horses because some of them "started getting sick" and were too thin.

The jury found Peterson guilty as charged of six counts of animal cruelty in the first degree. The court sentenced Peterson to 90 days on each count to be served concurrently, converted 30 days to community service, and allowed Peterson to serve 55 days on electronic home monitoring. The court ordered Peterson to pay Snohomish County for the costs incurred in caring for the seized horses.

## ANALYSIS

### Void for Vagueness

Peterson contends that the first degree animal cruelty statute is void for vagueness. We review the constitutionality of a statute de novo. City of Spokane v. Neff, 152 Wn.2d 85, 88, 93 P.3d 158 (2004). Where a vagueness challenge does not implicate the First Amendment, we evaluate the statute as applied to the particular facts of the case and the party's conduct. City of Seattle v. Montana, 129 Wn.2d 583, 597, 919 P.2d 1218 (1996).

The party asserting a vagueness challenge bears the heavy burden of proving beyond a reasonable doubt that the statute is unconstitutional. State v. Halstien, 122

Wn.2d 109, 118, 857 P.2d 270 (1993). A legislative enactment is presumed constitutional and we must "make every presumption in favor of constitutionality where the statute's purpose is to promote safety and welfare, and the statute bears a reasonable and substantial relationship to that purpose." State v. Glas, 147 Wn.2d 410, 422, 54 P.3d 147 (2002); Montana, 129 Wn.2d at 589.

A statute is unconstitutionally void for vagueness if it does not define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is proscribed, or provide ascertainable standards of guilt to protect against arbitrary enforcement. City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990).

The determination of whether a statute sufficiently defines a criminal offense with sufficient definiteness "does not demand impossible standards of specificity or absolute agreement." Douglass, 115 Wn.2d at 179. The fact that a statutory term is not defined and requires a subjective evaluation does not automatically mean that the statute is unconstitutionally vague. Douglass, 115 Wn.2d at 180. If persons "of ordinary intelligence can understand a penal statute, notwithstanding some possible areas of disagreement, it is not wanting in certainty." State v. Maciolek, 101 Wn.2d 259, 265, 676 P.2d 996 (1984).

For a statute to be unconstitutional, its terms must be " 'so loose and obscure that they cannot be clearly applied in any context.' " Douglass, 115 Wn.2d at 182 n.7 (quoting Basiardanes v. Galveston, 682 F.2d 1203, 1210 (5th Cir.1982)). Some vagueness is inherent in the use of language. Haley v. Med. Disciplinary Bd., 117 Wn.2d 720, 740, 818 P.2d 1062 (1991). In determining whether the statute gives fair

warning of the proscribed conduct, we must give the language a "sensible, meaningful, and practical interpretation." Douglass, 115 Wn.2d at 180.

> A criminal statute need not set forth with absolute certainty every act or omission which is prohibited if the general provisions of the statute convey an understandable meaning to the average person. This is especially true where the subject matter does not admit of precision.

City of Spokane v. Vaux, 83 Wn.2d 126, 130, 516 P.2d 209 (1973).

Peterson contends that because "unjustifiable physical pain" is not defined, the statute did not give fair warning of the proscribed conduct. RCW 16.52.205(2) defines the crime of first degree animal cruelty as follows:

> A person is guilty of animal cruelty in the first degree when, except as authorized by law, he or she, with criminal negligence, starves, dehydrates, or suffocates an animal and as a result causes: (a) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (b) death.

In context, the phrase "unjustifiable physical pain" gives fair notice of the objective standard of reasonableness that persons of ordinary intelligence would understand. "Unjustifiable" modifies "physical pain that extends for a period sufficient to cause considerable suffering" or death. "Unjustified" is defined as "not demonstrably correct or judicious; unwarranted in the light of surrounding circumstances." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2502 (2002). Pain is " 'a state of physical or mental lack of well-being or physical or mental uneasiness that ranges from mild discomfort or dull distress to acute often unbearable agony.' " State v. Zawistowski, 119 Wn. App. 730, 734, 82 P.3d 698 (2004) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1621 (1969)).

As applied, the first degree animal cruelty statute gave Peterson fair warning of the proscribed conduct. The undisputed evidence established that the animal control

officers repeatedly told Peterson that the horses were underweight, that she needed to provide food and water on a regular basis, and in early July, Officer Delgado warned Peterson that she risked criminal charges if she did not do so. In July and throughout August, Officer Davis told Peterson that she needed to feed and water the horses and get her horses up to an acceptable weight. The testimony also established that Peterson knew the horses were underweight.[2]

People v. Arroyo, 3 Misc. 3d 668, 777 N.Y.S.2d 836 (Crim. Ct. 2004), does not support Peterson's argument that the animal cruelty statute as applied is void for vagueness. In Arroyo, the court held that where the defendant did not provide chemotherapy for his terminally ill dog because the defendant believed chemotherapy would be painful and he could not afford the treatment, the animal cruelty statute proscribing unjustifiable pain was unconstitutionally vague. Arroyo, 3 Misc. 3d at 670, 680. While the court concluded the statute did not create "a duty on owners to provide their animals with medical care," the court specifically noted there was "no allegation that the defendant in any way neglected his animals," and distinguished cases where animals "were severely neglected, . . . showed signs of malnourishment," and had "emaciated bodies." Arroyo, 3 Misc. 3d. at 678-79.[3]

---

[2] For the first time in her reply brief, Peterson argues that the statute does not protect against arbitrary enforcement. We do not address arguments raised for the first time in a reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Nonetheless, Peterson's argument is without merit. A legislative enactment provides adequate standards to protect against arbitrary enforcement unless the statute resorts to "inherently subjective terms" or invites an inordinate amount of police discretion. Maciolek, 101 Wn.2d at 267. As applied, the statute is not so inherently subjective as to give inordinate discretion to law enforcement.

[3] Unlike RCW 16.52.205(2), the statues in the other out-of-state cases Peterson cites, State v. Ballard, 341 So. 2d 957, 960 (Ala. Crim. App. 1976); State v. Meinert, 225 Kan. 816, 819-20, 594 P.2d 232 (1979); and Cinadr v. State, 108 Tex. Crim. 147, 149-50, 300 S.W. 64 (Crim. App. 1927), do not define the crime of animal cruelty in the first degree to require proof that the defendant starved or dehydrated an animal causing unjustifiable pain extending for a period of time causing considerable suffering or death.

Peterson also claims the statute is unconstitutionally void for vagueness because she did not intentionally cause the horses pain, she was struggling financially, and a statutory exception allowed her to rely on the advice of her farrier. Peterson's arguments are without merit.

The crime of animal cruelty in the first degree requires proof of criminal negligence, not an intentional act.[4] While "economic distress beyond the defendant's control" is an affirmative defense to animal cruelty in the second degree, it is not an affirmative defense to animal cruelty in the first degree. See RCW 16.52.207(4); RCW 16.52.205. Further, RCW 16.52.205(6) does not support Peterson's argument that she was entitled to rely on the advice of her farrier. RCW 16.52.205(6) states: "Nothing in this section may be considered to prohibit accepted animal husbandry practices or accepted veterinary medical practices by a licensed veterinarian or certified veterinary technician." Here, there was no testimony showing that the farrier's advice was based on "accepted animal husbandry practices." RCW 16.52.205(6).

We reject Peterson's argument that as applied, the first degree animal cruelty statute is unconstitutionally vague.

Alternative Means

In the alternative, Peterson contends that starvation and dehydration are alternative means of committing the crime of animal cruelty in the first degree, and substantial evidence does not establish the horses were suffering from dehydration. The State argues that starvation and dehydration are not statutory alternative means.

---

[4] RCW 9A.08.010(1)(d) states:

A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

Criminal defendants have the right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994).[5] But unanimity is not required "as to the means by which the crime was committed so long as substantial evidence supports each alternative means." State v. Kitchen, 110 Wn.2d 403, 410, 756 P.2d 105 (1988).[6]

An alternative means crime sets forth "distinct acts that amount to the same crime." State v. Peterson, 168 Wn.2d 763, 770, 230 P.3d 588 (2010).[7] Where a statute is "merely" definitional or descriptive of an element of the crime, the statute does not set out alternative means. State v. Smith, 159 Wn.2d 778, 787, 154 P.3d 873 (2007). Further, "a defendant may not simply point to an instruction or statute that is phrased in the disjunctive in order to trigger a substantial evidence review of her conviction." Smith, 159 Wn.2d at 783.

RCW 16.52.205 sets forth different ways by which a person can commit the crime of animal cruelty in the first degree, including intentionally killing an animal, RCW 16.52.205(1)(c); with criminal negligence starving, dehydrating, or suffocating an animal causing unjustifiable physical pain or suffering, RCW 16.52.205(2); or knowingly engaging in sexual conduct or contact with an animal, RCW 16.52.205(3)(a). RCW 16.52.205 states, in pertinent part:

> (1) A person is guilty of animal cruelty in the first degree when, except as authorized in law, he or she intentionally (a) inflicts substantial pain on, (b) causes physical injury to, or (c) kills an animal by a means causing undue suffering, or forces a minor to inflict unnecessary pain, injury, or death on an animal.

---

[5] Peterson may raise this issue for the first time on appeal. See RAP 2.5(a)(3); Ortega-Martinez, 124 Wn.2d at 707.

[6] (Emphasis omitted.)

[7] (Emphasis omitted.)

(2) A person is guilty of animal cruelty in the first degree when, except as authorized by law, he or she, with criminal negligence, starves, dehydrates, or suffocates an animal and as a result causes: (a) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (b) death.

(3) A person is guilty of animal cruelty in the first degree when he or she:

(a) Knowingly engages in any sexual conduct or sexual contact with an animal;

(b) Knowingly causes, aids, or abets another person to engage in any sexual conduct or sexual contact with an animal;

(c) Knowingly permits any sexual conduct or sexual contact with an animal to be conducted on any premises under his or her charge or control;

(d) Knowingly engages in, organizes, promotes, conducts, advertises, aids, abets, participates in as an observer, or performs any service in the furtherance of an act involving any sexual conduct or sexual contact with an animal for a commercial or recreational purpose; or

(e) Knowingly photographs or films, for purposes of sexual gratification, a person engaged in a sexual act or sexual contact with an animal.

The information charged Peterson with committing the crime of animal cruelty in the first degree by starving or dehydrating six horses in violation of RCW 16.52.205(2). Consistent with the charging document, the jury instructions required the State to prove beyond a reasonable doubt that acting with criminal negligence, Peterson "starved or dehydrated" the six horses causing "substantial and unjustifiable physical pain that

21

extended for a period sufficient to cause considerable suffering."[8] See State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998) (jury instructions not objected to become the law of the case). The jury convicted Peterson of six counts of animal cruelty in the first degree.

We hold that starvation, dehydration, and suffocation are different ways of committing the crime of animal cruelty in the first degree and are not merely descriptive or definitional but rather, separate and essential terms of the offense.

The State attempts to distinguish State v. Nonog, 145 Wn. App. 802, 187 P.3d 335 (2008), by arguing that it is an exception to the general rule that alternative means statutes set out those means in numbered subsections. In Nonog, the defendant was charged with interfering with domestic violence reporting in violation of RCW 9A.36.150(1). Nonog, 145 Wn. App. at 806. RCW 9A.36.150(1) provides:

A person commits the crime of interfering with the reporting of domestic violence if the person:

---

[8] The to-convict jury instruction as to Tyme states, in pertinent part:

To convict the defendant of the crime of animal cruelty in the first degree, as charged in count one, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That during a period of time intervening between April 12th, 2009 and July 15th, 2009, the defendant, acting with criminal negligence, starved or dehydrated a horse known as Tyme;

(2) As a result, the horse suffered substantial and unjustifiable physical pain that extended for a period sufficient to cause considerable suffering or death.

(Emphasis added.)

The to-convict jury instructions as to the other five horses state, in pertinent part:

To convict the defendant of the crime of animal cruelty in the first degree, as charged in count one, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That during a period of time intervening between June 1st, 2009 and September 9th, 2009, the defendant, acting with criminal negligence, starved or dehydrated a horse . . . ;

(2) As a result, the horse suffered substantial and unjustifiable physical pain that extended for a period sufficient to cause considerable suffering.

(Emphasis added.)

22

(a) Commits a crime of domestic violence, as defined in RCW 10.99.020; and

(b) Prevents or attempts to prevent the victim of or a witness to that domestic violence crime from calling a 911 emergency communication system, obtaining medical assistance, or making a report to any law enforcement official.

The State argued that the three ways of attempting to report a crime "are simply definitional and that the crime itself may be committed by only one means, i.e., by preventing (or attempting to prevent) the victim or witness from making a report." Nonog, 145 Wn. App. at 812. We recognized that typically an alternative means statute will state a single offense with subsections describing how the crime is committed. Nonog, 145 Wn. App. at 812. But we held that the variations in RCW 9A.36.150(1) are not merely descriptive or definitional, but are themselves essential terms establishing alternative means of committing the crime. Nonog, 145 Wn. App. at 812-13.

Here, as in Nonog, the animal cruelty in the first degree statute, RCW 16.52.205(2), sets out three distinct ways of committing the crime, starvation, dehydration, and suffocation, that are not descriptive or definitional but are essential elements of the crime of animal cruelty in the first degree.[9]

In determining the sufficiency of the evidence for the alternative means of dehydration, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002).[10]

---

[9] See also State v. Hayes, 164 Wn. App. 459, 474, 262 P.3d 538 (2011) (leading organized crime statute, RCW 9A.82.060, which prohibits intentionally organizing, managing, directing, supervising, or financing "any three or more persons with the intent to engage in a pattern of criminal profiteering activity," contains five alternative means).

[10] Peterson concedes substantial evidence supports the alternative means of starvation.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could find the State proved beyond a reasonable doubt that acting with criminal negligence, Peterson dehydrated the horses causing substantial and unjustifiable pain.

The evidence showed that throughout the summer of 2009, the horses often did not have water to drink. An average horse needs to drink between six and 10 gallons of water a day. Borchardt testified that when Peterson leased his field, the horses were frequently without any water, even on very hot days. After Peterson moved her horses to the Trout Farm Road property, Auckland and the animal control officers testified that on numerous occasions, the horses did not have any water. Officer Delgado and Officer Davis described how when they filled the trough with water, the horses ran to the officers, jostling to drink from the trough as soon as water was poured into it.

Dr. Haskins testified that the horses running to water was a serious indication of the horses' level of dehydration. Dr. Haskins testified that when he went to the Trout Farm Road property on September 9, the water trough in Enclosure C was "devoid of water[,] bone dry." In his opinion, there had not been any water in the trough that day and that "it was a significant period of time before there had been water in there."

Q    Doctor Haskins, before we move to October, I forgot to ask you one thing about September 9th. Did you ever make any observations about the bone dry water tub that you described and what happened after it was filled?
A    Well, definitely we were concerned that these horses, with that bone dry water tub, had been without water for some period of time, and that it was important to do the assessment, but it was more important that these horses get some water to them. So one of the officers brought a hose from the house or somewhere over that way and started running water into that tub.
    And immediately at least three or four of those horses went running over to the water tub to get water. And that's a pretty serious indication of level of dehydration if you get horses that aren't kind of just moseying on over there; they're running to water.

24

Dr. Haskins said that based on his evaluation of the horses that were seized on September 9, the horses were "suffering and were in actual physical pain due to the extreme conditions that they were subjected to."

Without citation to authority, Peterson contends substantial evidence does not support the jury verdict because the veterinarian witnesses could not testify to a reasonable medical certainty that dehydration caused the horses to suffer substantial and unjustifiable physical pain. We disagree.

In Zawistowski, the jury found the defendants guilty of two counts of animal cruelty in the second degree.[11] Zawistowski, 119 Wn. App. at 733. On appeal, the court addressed whether sufficient evidence supported the jury determination that the horses suffered pain as a result of being severely underweight and malnourished. Zawistowski, 119 Wn. App. at 736-37. During trial, a number of witnesses testified, including neighbors, humane society officers, and a veterinarian describing the horses as severely underweight. Zawistowski, 119 Wn. App. at 737. The State also introduced photographs showing the horses' protruding ribs and hip bones. Zawistowski, 119 Wn. App. at 736 n.2, 737. We held that the jury could reasonably infer from the evidence that the horses felt extreme hunger, and that extreme hunger is capable of causing

---

[11] Former RCW 16.52.207 (1994). LAWS OF 1994, ch. 261, § 9. Former RCW 16.52.207(2) prohibited "knowingly, recklessly, or with criminal negligence . . . (a) fail[ing] to provide the animal with necessary food, water, shelter, rest, sanitation, ventilation, space or medical attention and the animal suffers unnecessary or unjustifiable physical pain." The legislature amended RCW 16.52.207 in 2005 to remove failure to provide food, water, and ventilation from the second degree animal cruelty statute and make starvation, dehydration, and suffocation a first degree offense. LAWS OF 2005, ch. 481, §§ 1-2.

unnecessary and unjustifiable pain. Zawistowski, 119 Wn. App. at 737.[12]

We hold that whether the horses suffered unjustifiable pain and suffering caused by dehydration is a matter of common knowledge and ordinary experience which the jury could determine without the aid of expert testimony, and sufficient evidence supports the jury's verdict. "[A] juror is expected to bring his or her opinions, insights, common sense, and everyday life experiences into deliberations." State v. Carlson, 61 Wn. App. 865, 878, 812 P.2d 536 (1991).

As in Zawistowski, a rational trier of fact could find that Peterson acted with criminal negligence in dehydrating the horses, resulting in substantial and unjustifiable physical pain that extended for a period sufficient to cause considerable suffering.

Restitution

Peterson also argues the court did not have the authority to order restitution to Snohomish County for the cost of caring for the horses after they were seized. Peterson contends the court is only authorized to order restitution under the Sentencing Reform Act of 1981, chapter 9.94A RCW (SRA). Peterson claims that because Snohomish County is not a "victim" under the SRA, the court erred in ordering her to pay restitution. The State asserts that under RCW 16.52.200(6),[13] the court had the authority to order Peterson to pay Snohomish County for the cost of caring for the horses. We agree with the State.

---

[12] Zawistowski involved second degree animal cruelty which requires a showing of "unnecessary or unjustifiable" physical pain, former RCW 16.52.207, while first degree animal cruelty requires "[s]ubstantial and unjustifiable" physical pain. RCW 16.52.205(2)(a) (emphasis added).

[13] We note that former RCW 16.52.200(5) (2011) was renumbered as RCW 16.52.200(6) in 2011. LAWS OF 2011, ch. 172, § 4. The 2011 amendment made no substantive change to this provision.

The authority to impose restitution is statutory. <u>State v. Griffith</u>, 164 Wn.2d 960, 965, 195 P.3d 506 (2008). Statutory interpretation is a question of law reviewed de novo. <u>State v. Burns</u>, 159 Wn. App. 74, 78, 244 P.3d 988 (2010). We must consider and harmonize statutory provisions to give effect to the legislature's intent. <u>Mason v. Georgia-Pacific Corp.</u>, 166 Wn. App. 859, 864, 271 P.3d 381 (2012).

The court ordered Peterson to pay Snohomish County for the costs incurred to care for the horses that were seized under RCW 16.52.200(6). RCW 16.52.200(6) provides:

> In addition to fines and court costs, the defendant, only if convicted or in agreement, shall be liable for reasonable costs incurred pursuant to this chapter by law enforcement agencies, animal care and control agencies, or authorized private or public entities involved with the care of the animals. Reasonable costs include expenses of the investigation, and the animal's care, euthanization, or adoption.

The plain language of the statute states that if convicted, the defendant is liable for the care of the horses. RCW 16.52.200(6). We hold the court had the authority under RCW 16.52.200(6) to order Peterson to pay the costs incurred by Snohomish County to care for the horses.

We affirm.

Schindler, J.

WE CONCUR:

Leach, C.J.

Becker, J.

27