

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72515-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| EC EDWARD COBB, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 7, 2016 |
| | ) | |

LAU, J. — EC Edward Cobb appeals his convictions for two counts of felony violation of a no-contact order and witness tampering. He argues (1) his witness tampering conviction violates his right to a unanimous jury, (2) insufficient evidence exists to prove an alternative means of felony violation of a no-contact order, (3) violations of his public trial right and right to be present at a critical stage of the proceedings, and (4) striking all references to "domestic violence" in the judgment and sentence is required. Finding no error, we affirm his convictions. But we accept the State's proper concession and remand for correction of the judgment and sentence.

## FACTS

In April 2014, a no-contact order prohibited EC Edward Cobb from having contact with Monique Bojang.

On April 29, 2014, Cobb called Bojang and asked her to meet him so they could talk. Bojang went to Cobb's apartment, where they spoke for about 45 minutes before driving to Jack in the Box for lunch. They returned to the apartment and sat in the car eating.

Bojang testified that after talking for a while, Cobb became upset and aggressive. She said he hit her in the face and on her side with his fists and his open hand. Cobb stopped briefly, but started hitting her again. Bojang discussed "three cycles" of hitting. Report of Proceedings (RP) (Aug. 18, 2014) at 456. Bojang called 911 and told the operator that she was "beat up" and that Cobb "mangle[ed] my face." RP (Aug. 18, 2014) at 465.

A police officer responded and located Bojang in her car. The officer photographed a scratch on her left cheek and a scratch on her "inner bottom lip." RP (Aug. 18, 2014) at 422. The officer observed no bruises, welts, or swelling. Bojang declined medical attention.

After his arrest, Cobb made numerous calls from the jail to Bojang, his sister, Louise Lucas, and a friend, to convince Bojang to alter her testimony or not to testify at trial.[1]

---

[1] The friend's name does not appear in our record. The sister's name appears as "Elaine." RP (Aug. 19, 2014) at 634.

-2-

On May 1, 2014, the State charged Cobb with one count of domestic violence felony violation of a no-contact order based on his contact with Bojang.

On August 11, 2014, the State added two additional counts of domestic violence felony violation of a no-contact order and one count of witness intimidation based on the telephone calls Cobb made from jail.

During jury selection, the attorneys exercised their peremptory challenges by writing them on paper. The document was filed with the court record.

At trial, the court admitted transcripts of 15 separate telephone calls Cobb made from jail over a period of 3 months to prove the witness tampering charge.[2] The recorded telephone calls were also admitted and played to the jury.

The jury found Cobb guilty on two counts of felony violation of a no-contact order, acquitted him on the third count and found him guilty on the lesser-included offense of witness tampering.

The court imposed concurrent 60-months sentences on each conviction for felony violation of a court order. The court imposed an exceptional 12-month consecutive sentence for the witness tampering conviction based on Cobb's high offender score resulting in, "some of the current offenses would go unpunished." Clerk's Papers (CP) at 224, 228.

Cobb appeals.

---

[2] To convict Cobb of witness tampering, the State had to prove Cobb attempted to induce a witness, or person he believes was about to be a witness, "to testify falsely or, without right or privilege to do so, to withhold any testimony, or to absent herself from any official proceeding, or to withhold from law enforcement agency information which he or she has relevant to a criminal investigation." CP at 274.

## ANALYSIS

### Jury Unanimity

Cobb claims that because the State presented evidence of several distinct acts of possible witness tampering, "either the court was required to provide unanimity instruction, or the State was required to elect a particular act it was relying upon." Br. of Appellant at 7.

A criminal defendant's right to a unanimous jury verdict is based on the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. State v. Brown, 159 Wn. App. 1, 14, 248 P.3d 518 (2010). Where the evidence indicates that more than one distinct criminal act has been committed, but the defendant is charged with only one count of criminal conduct, a jury must unanimously agree on which act constituted the crime. State v. Furseth, 156 Wn. App. 516, 519 n.3, 233 P.3d 902 (2010); State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). In other words, the "jury must be unanimous as to which act or incident constitutes a particular charged count of criminal conduct." State v. Borsheim, 140 Wn. App. 357, 365, 165 P.3d 417 (2007). To safeguard this right, the State must either elect the act it is relying on or the court must instruct the jury to unanimously agree that at least one particular act constituting the charged crime has been proved beyond a reasonable doubt. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

It is well settled that no election or unanimity instruction is required if the evidence establishes a "continuing course of conduct." Petrich, 101 Wn.2d at 571. We review the facts in a commonsense manner to determine whether

criminal acts consist of a continuing course of conduct. Petrich, 101 Wn.2d at 571. Although evidence of conduct occurring at different times or places tends to show several distinct acts, evidence the defendant engaged "in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than several distinct acts." State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995). Indeed, in some cases, a series of actions involving the same victim and same objective spanning a long period of time may satisfy the course of conduct exception. State v. Garman, 100 Wn. App. 307, 317, 984 P.2d 453 (1999) (multiple instances of theft targeting the same victim over time aggregated as common scheme or plan does not require unanimity instruction). To determine whether a continuing course of conduct exists for purposes of Petrich, a court will "evaluate the facts in a commonsense manner considering (1) the time separating the criminal acts and (2) whether the criminal acts involved the same parties, location, and ultimate purpose." State v. Brown, 159 Wn. App. 1, 14, 248 P.3d 518 (2010).

The failure to provide a unanimity instruction where required is a manifest constitutional error Cobb may raise for the first time on appeal. RAP 2.5(a)(3); Furseth, 156 Wn. App. at 519 n.3.

Here, the evidence indicates Cobb made 15 telephone calls attempting to induce Bojang to alter her testimony or not testify. Cobb claims that because each of the calls independently support a conviction for witness tampering, the

State was required to either elect which act it was relying on or the court was required to give a unanimity instruction to the jury.

Cobb relies on State v. Hall, a case involving whether a defendant's multiple convictions for witness tampering violated double jeopardy. The court applied a unit of prosecution analysis, concluding that under the particular facts presented, the multiple convictions violated double jeopardy. Cobb's case implicates no double jeopardy unit of prosecution analysis. To the extent Cobb claims the legislature's 2011 amendment to the witness tampering statute supports his argument, we are unpersuaded.

In Brown, we held that a defendant's frequent attempts over a six-week period to contact a victim in violation of a no-contact order constituted a continuing course of conduct for purposes of Petrich. Brown, 159 Wn. App. at 13-15. As in the present case, the time separating the different acts was relatively short and involved the same parties, location, and ultimate purpose. Brown, 159 Wn. App. at 15.

Like the defendant in Brown, each of Cobb's jailhouse calls shared the same goal: to induce Bojang to alter her testimony or not testify. This purpose was apparent in the calls he made to Bojang, his girlfriend Lucas, his sister, and his friend.

For example, Cobb called Bojang from jail and told her "[y]ou better tell these people something, man. And hurry the f—k up. Okay?" Exhibit (Ex.) 28B at 5. Bojang responded "[t]ell them what, lies?" Ex. 28B at 5.

Calling her only a few hours later, Cobb declared his love for Bojang, telling her "I need your mind to be right there with me right now because this is a difficult situation right here." Ex. 30B at 6. Cobb said they "have to think about what we're gonna do and say and other things," and that Bojang has to "go change that okay you gotta go change that you and you gotta be sending in stuff and letting 'em know." Ex. 30B at 6. Cobb told her to "exaggerate it a little bit or whatever okay and just this is the time that you do that." Ex. 30B at 6.

In several telephone calls to his sister, Lucas, and his friend, he asked them to send letters to the court claiming "it didn't happen, that she exaggerated because she was mad and everything." Ex. 32B at 10; Ex. 27 B. at 5. He told Lucas to "[c]all her up, send a text, or whatever and let her know what's going on. . . . [T]hat 'I wasn't nowhere, I didn't go nowhere' or whatever 'she came over' . . . and she needs to tell these people what she needs to tell 'em." Ex 27B at 5.

Cobb also called his sister for help to arrange a paid trip to Hawaii for Bojang. He told her to "find out, um, when, the Hawaii thing's going on because I'll get the money for that," and "you know about the, the little interviews and stuff and everything, if that happens then there's no way that this stuff can get dropped, okay? She can't go to none of the interviews and stuff like that." Ex. 32B at 8, 17. He suggested giving her money, stating "somebody need to stay in her ear" and "sometimes they be offering money and all that to people and what not." Ex 32B at 13. Cobb asked his sister to tell Bojang to "[r]efrain from everything." Ex. 32B at 9.

The fifteen telephone calls occurred over the course of three months and shared the common goal of convincing Bojang to alter her testimony or not to testify at trial.

As the State contends, many of the calls, considered individually, fail to establish the offense of witness tampering beyond a reasonable doubt.[3] The evidence shows Cobb attempted to speak in code and avoided mentioning Bojang by her name.[4] The calls obliquely reference the means Cobb planned to use to convince Bojang to alter her testimony. Considered together, the series of telephone calls establish an ongoing course of conduct intended to achieve the ultimate goal of inducing Bojang to alter or not provide testimony against Cobb.

We conclude the evidence establishes a continuing course of conduct requiring no election or unanimity instruction.

<u>Sufficiency of the Evidence</u>

Cobb challenges the sufficiency of the evidence to support one of the alternative means of committing the crime of felony violation of a court order.

A criminal defendant's right to a unanimous jury verdict under article I, section 21 of the Washington Constitution includes the right to have a unanimous jury determine the means by which he committed the crime. <u>State v. Owens</u>, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).[5] When reviewing a sufficiency of the

---

[3] Cobb agrees many of these transcripts are "cryptic and ambiguous." Br. of Appellant at 15.

[4] Jail inmates are informed that their telephone calls are recorded by the King County Correctional Facility.

[5] This right is guaranteed under article I, section 21 and section 22 of the Washington State Constitution. <u>State v. Lamar</u>, 180 Wn.2d 576, 583, 327 P.3d 46 (2014).

evidence challenge based on alternative means, we "apply the rule that when there is sufficient evidence to support each of the alternative means of committing the crime, express jury unanimity as to which means is not required." Owens, 180 Wn.2d at 95. But if "there is insufficient evidence to support any means, a particularized expression of jury unanimity is required." Owens, 180 Wn.2d at 95. In other words, "[a] general verdict of guilty on a single count charging the commission of a crime by alternative means will be upheld only if sufficient evidence supports each alternative means." State v. Kintz, 169 Wn.2d 537, 552, 238 P.3d 470 (2010).

In challenging the sufficiency of the evidence, Cobb admits the truth of the State's evidence and all reasonable inferences that can be drawn therefrom. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). These inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." Homan, 181 Wn.2d at 106. Evidence is sufficient where a rational trier of fact could have found each of the alternative means beyond a reasonable doubt. State v. Ortega-Martinez, 124 Wn.2d 702, 708, 881 P.2d 231 (1994).

Cobb may challenge the lack of a unanimous jury verdict for the charged alternative means for the first time on appeal. RAP 2.5(a)(3); State v. Peterson, 174 Wn. App. 828, 849 n.5, 301 P.3d 1060 (2013).

The State charged Cobb with the crime of felony violation of a court order, alleging three alternative means: (1) he intentionally assaulted Bojang, (2) he engaged in conduct that was reckless and created a substantial risk of death or serious physical injury to Bojang, or (3) Cobb has twice been previously

convicted for violating the provisions of a court order. The jury was instructed on each of these alternative means in the "to-convict" instruction:

> To convict the defendant of the crime of felony violation of a court order as charged in Count 1, each of the following five elements of the crime must be proved beyond a reasonable doubt:
> . . . .
> (4) That
>     (a) The defendant's conduct was an assault or
>     (b) The defendant's conduct was reckless and created a substantial risk of death or serious physical injury to another person or
>     (c) The defendant has twice been previously convicted for violating the provisions of a court order; and

CP at 256.

Cobb contends insufficient evidence exists to prove beyond a reasonable doubt that his conduct was reckless and created a substantial risk of death or serious physical injury to Bojang. He argues that the evidence showed, at most, that his conduct was a simple assault. We disagree.

At trial, Bojang testified that Cobb "just got upset and started hitting me" and that "[h]e was hitting me with fists and open hand—slapping me and hitting me." RP (Aug. 18, 2014) at 455-56. She stated that "[h]e got me a couple times in the face and alongside my side. I was trying to block his punches." RP (Aug. 18, 2014) at 456. Bojang stated there were "three cycles" of hitting. RP (Aug. 18, 2014) at 456. Bojang said she called 911 after the third cycle because "I was just shocked," and she tried to position herself so "he didn't notice I was calling." RP (Aug. 18, 2014) at 456. After Cobb was arrested, Bojang told Cobb she had a headache, her "head is swollen," and "my face is frickin' sore, swollen, swelling up." Ex. 29B at 2; Ex. 30B at 4.

-10-

Assuming the truth of the State's evidence, we conclude sufficient evidence exists for a rational trier of fact to conclude Cobb's conduct "was reckless and created a substantial risk of death or serious physical injury to another person." CP at 256. Cobb attacked Bojang in an enclosed space with closed fists. He struck her in the face and on her side. Bojang described her face as swollen and sore. "Without question, any reasonable person knows that punching someone in the face could result in a broken jaw, nose, or teeth, each of which would constitute substantial bodily harm." State v. R.H.S., 94 Wn. App. 844, 847, 974 P.2d 1253 (1999). Cobb's sufficiency of the evidence challenge fails.

### Right to a Public Trial

Cobb argues that his right to a public trial was violated when the attorneys conducted peremptory challenges on paper during jury selection.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a 'public trial by an impartial jury.'" State v. Momah, 167 Wn.2d 140, 147, 217 P.3d 321 (2009). Article I, section 10, provides the additional guarantee that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." State v. Love, 183 Wn.2d 598, 604-05, 354 P.3d 841 (2015). "These related constitutional provisions 'serve complementary and interdependent functions in assuring the fairness of our judicial system" and are often called the "'public trial right.'" Love, 183 Wn.2d at 605, quoting State v. Bone-Club, 128 Wn.2d 254, 259, 906 P.2d 325 (1995). The public trial right is implicated in the

voir dire portion of jury selection. State v. Wise, 176 Wn.2d 1, 12 n.4, 288 P.3d 1113 (2012). Whether a defendant's right to a public trial has been violated is a legal question we review de novo. Wise, 176 Wn.2d at 9.

During jury selection, the court asked the parties to approach the bench to submit peremptory challenges in writing. Two jurors were excused by peremptory challenge without stating out loud which party made the challenge. The manner in which the parties exercised their peremptory challenges was noted on a form and filed with the court.

Cobb argues that the process of exercising peremptory challenges in writing violates his constitutional right to an open trial. We disagree.

In Love, the Washington Supreme Court rejected Cobb's contention. It explained that exercising peremptory challenges in writing did not constitute a courtroom closure when it occurred in open court on the record. Accordingly, the court held no public trial right violation occurred:

> [T]he public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public; no juror was questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publically available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury selection.

Love, 183 Wn.2d at 607. The court concluded that "written peremptory challenges are consistent with the public trial right so long as they are filed in the public record." Love, 183 Wn.2d at 607.

Love controls. Here, all jurors were questioned in open court. The court filed the record of the written challenges in the record, allowing for public review of the manner in which the parties used their challenges. We conclude no public trial right violation occurred.

### Defendant's Presence at a Critical Stage

Cobb also argues that the procedure for exercising peremptory challenges violates his right to be present at a critical stage of a criminal proceeding. "Our state and federal constitutions protect the right of a criminal defendant to be present 'at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.'" Love, 183 Wn.2d at 608, quoting Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987). This protection is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington Constitution. Love, 183 Wn.2d at 608.

In Love, the court also concluded that exercising peremptory challenges on paper in open court did not violate the right to be present:

> Love was present in the courtroom during all of voir dire, including potential jurors' answers to questions that form the basis for challenges. Nothing suggests that Love could not consult with his attorney about which jurors to challenge or meaningfully participate in the process. . . . Love's right to be present claim also fails.

Love, 183 Wn.2d at 608.

-13-

Love controls. Although in Love peremptory challenges were exercised at a bench conference and not on paper, the difference does not alter our conclusion. As in Love, Cobb was present in court, was present for voir dire, and was able to consult with his attorney regarding potential juror challenges. Cobb's claim fails.[6]

### Judgment and Sentence

Cobb argues that his judgment and sentence must be corrected to reflect that the jury did not find the crimes were "domestic violence" offenses. Br. of Appellant at 34.

The State alleged that each of the charged crimes were domestic violence offenses because they occurred "against a family or household member." CP at 10-12; RCW 10.99.020(5). The jury was provided with a special verdict form and instructed to find whether Cobb and Bojang were "members of the same family or household prior to or at the time the crime was committed." CP at 167. The jury left the form blank. The judgment and sentence entered by the court, however, indicates Cobb was convicted of three "domestic violence" offenses, and that "Domestic violence as defined in RCW 10.99.020 was pled and proved for count(s) I, III, IV." CP at 221-22.

The State correctly concedes that remand is required for correction of the judgment and sentence to strike all references to domestic violence.

---

[6] Given our Supreme Court's dispositive treatment of this issue in Love, we do not find Cobb's citations to other non-binding authority persuasive.

Statement of Additional Grounds (SAG)

Cobb filed a statement of additional grounds.  But his assertions lack the specificity necessary for appellate review.  RAP 10.10(c) ("[T]he appellate court will not consider a defendant/appellant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of the alleged errors."); State v. O'Connor, 155 Wn. App. 282, 293-94, 229 P.3d 880 (2010) ("an appellate court is not obligated to search the record in support of claims made in a defendant/appellant's statement of additional grounds for review").

For example, Cobb first claims that during trial there was a voir dire procedure "where the judge was undecided regarding the constitutionality of past NCO's Violations that are being used as a basis to establish this charge as a felony." SAG at 1.  The record shows the trial court ruled on the admissibility of his past convictions.

Cobb argues "I believe there are juvenile points that are being incorrectly and unconstitutionally used in this cases total points calculation." SAG at 1.  We perceive no inaccuracies in the calculation of Cobb's offender score.

Cobb argues that during trial he was kept on "phone deadlock" and was therefore unable "to inform a witness when and where to testify." SAG at 2.  He claims that because there was no hearing this was unconstitutional.  We see no basis for review of this claim.

Cobb argues that his attorney "did not read to me the trial procedures, and therefore I had no idea of what to expect or if something should or should not

have been happening during trial." SAG at 2. Cobb's claim fails to direct us to any point in the record or legal theory that could provide relief.

CONCLUSION

As discussed above, we affirm Cobb's convictions. But we accept the State's proper concession and remand to the trial court with instructions to strike any reference to domestic violence appearing in the judgment and sentence.

_Jau, J._

WE CONCUR:

_Leach, J._

_Becker, J._