[No. 26594. Department Two. December 16, 1937.]

SILAS W. COOK et al., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent.*[1]

[1]Reported in 74 P. (2d) 199.

*W. W. Clarke,* for appellants.

*The Attorney General* and *L. C. Brodbeck, Assistant,* for respondent.

ROBINSON, J.—When this action came on for trial in the lower court and a jury had been impanelled and an opening statement made on behalf of the plaintiffs, the state objected to the introduction of any evidence upon the ground that the complaint, as amplified by the opening statement, failed to state sufficient facts to constitute a cause of action. The objection was treated as a general demurrer and, as such, sustained by the court. A judgment of dismissal was entered, and this appeal was taken therefrom.

The factual allegations of the complaint must, therefore, be taken as admitted. They are, in substance, as follows: The plaintiffs, Silas Cook and wife, for some years, owned a thirty-five acre farm near Spokane, through which flows the Little Spokane river and Deadman creek. On this farm, by diking, ditching,

and excavating, they made a shallow, artificial lake covering an area of about five acres, fed by the waters of Deadman creek. In the winter time, when the lake was covered with ice, they conducted a public outdoor skating rink. The business prospered, and a large number of people from Spokane and vicinity patronized it.

The Little Spokane river and Deadman creek were the natural habitat of beaver and muskrats. For some years, plaintiffs protected the dam from threatened injury by these animals by employing persons to trap them.

In 1933, the state game commission, acting under the authority of the state game code, declared a certain area, which included plaintiffs' farm, a wild life sanctuary or refuge, in which it should be unlawful to hunt or kill or trap game or fur-bearing animals, including muskrats. Plaintiffs, foreseeing from past experience that the beavers, if left to their own devices, would dam up the ditch regulating the inflow of water from Deadman creek and the muskrats would burrow through the dike and in this manner destroy the skating rink, notified the game commission of their past experience with these animals and requested permission to continue to trap them alive and convey them to other locations. But their request was refused. They thereupon requested the game commission to cause the muskrats to be trapped and save the skating rink from imminently threatened damage. This the commission refused to do. Some traps were found set on the premises. They were confiscated by the game authorities, and Mr. Cook was emphatically warned that anyone found trapping there would be arrested, prosecuted, and fined.

One evening in early November, 1935, while the lake was thronged with people skating to the music of an

orchestra, the ice began to settle and crack in all directions, and so badly that it was impossible to skate on it. Upon investigation, it was found that there was no water supporting the ice. The beaver had dammed the ditch from Deadman creek which supplied the water to the pond, and the muskrats, on the other hand, had burrowed through the dike, permitting the water, which was already there, to escape.

The plaintiffs were unable to restore the rink for several weeks and, as a consequence, lost five thousand dollars in revenue. In addition to this, it is alleged that they were damaged in the sum of one thousand five hundred dollars with respect to the loss of good will; it being their theory that persons who had long patronized them became accustomed to going to other rinks and never returned.

The plaintiffs, as appellants here, contend that, since Rem. Rev. Stat. (Sup.), § 5889 [P. C. § 2620] (Laws of 1933, chapter 3, p. 41, § 34), grants the power of eminent domain to the game commission for the condemnation of property deemed necessary for its use for hatchery sites, rearing ponds, and fur-bearing animal sanctuaries, it is intended that it shall have the right to establish such sanctuaries only in that manner. We think, however, that this section was intended to cover situations where the commission desires full ownership of property for such purposes.

In the case at bar, as we understand the allegations of the complaint, the commission merely defined an area within the boundaries of which it forbade, for an indefinite time, the hunting, trapping, killing or taking of fur-bearing animals. This, we think, the commission undoubtedly had a right to do under the broad general powers granted to it by the game code. Rem. Rev. Stat. (Sup.), §§ 5855-7 and 5870 [P. C.

§§ 4-107g, 2601] (Laws of 1933, chapter 3, pp. 30, 32, §§ 13, 19).

■ The appellants contend, with greater plausibility, that the facts show a taking and damaging of their property contrary to § 16 of Art. I of the state constitution, which reads, in part, as follows:

" . . . No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, . . ."

It is pointed out that, in order to constitute a taking or damaging within this provision of the constitution, it is not necessary that the owner of the property be actually deprived of the property itself or even of a part of it; and to this effect a great number of cases are cited, as, for example, *Burrows v. Grays Harbor Boom Co.*, 44 Wash. 630, 87 Pac. 937, where the land of riparian proprietors was overflowed above the line of ordinary high water mark; *Jacobs v. Seattle*, 93 Wash. 171, 160 Pac. 299, L. R. A. 1917B, 329, where the value of land was depreciated by the fact that the city of Seattle maintained an incinerator adjacent thereto for the burning of garbage; *Great Northern R. Co. v. State*, 102 Wash. 348, 173 Pac. 40, L. R. A. 1918E, 987, where the state highway, in building a highway, blasted rock and other material upon a railroad track belonging to plaintiff, interrupting its use; *Conger v. Pierce County*, 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393, where adjoining counties, under legislative authority, in improving a navigable stream for the purpose of preventing overflows, caused the erosion and washing away of plaintiffs' land, by deflecting the current of the stream; *Southworth v. Seattle*, 145 Wash. 138, 259 Pac. 26, where plaintiff was permitted to recover for damage to his property from a sewage disposal plant adjacent to it; *Spokane, P. & S. R. Co.*

*v. State,* 159 Wash. 529, 294 Pac. 231, where the road-bed of the railway was rendered temporarily useless by blasting done in constructing the highway.

Other Washington cases of the same general description are cited as follows: *Aliverti v. Walla Walla,* 162 Wash. 487, 298 Pac. 698; *Litka v. Anacortes,* 167 Wash. 259, 9 P. (2d) 88; *State v. Superior Court for Walla Walla County,* 167 Wash. 334, 9 P. (2d) 70. A number of other cases of the same type are cited from other jurisdictions.

The cases cited, and cases of that type, of which appellants rightly say there is a multitude, have but little to do with the question in the case at bar. They are cases where the taker had no right of any kind whatever in or with respect to the land claimed to have been taken or damaged, and in all of them there was either an illegal trespass or the maintenance of a nuisance. If the state, in building a highway, throws rocks on a railway so that it cannot be used, or, in seeking to control a river, backs up water on private land, or, if the city lessens the value of private land by operating an incinerator on adjacent property, such acts constitute a trespass and a taking. But the state has the absolute right to maintain its game and wild animals upon any and all private lands, and in that act there is no element of trespass or taking.

To a layman, and even to a lawyer who has not had occasion to deal with the subject, the extent of the power of the states with reference to fish, game, and all wild life within their borders is perfectly astounding. The laws of practically all of our states are founded upon the common law of England by virtue of which all property rights in *ferae naturae* were in the sovereign. The killing, taking, and regulation of game and other wild life were subject to absolute governmental control for the common good. This ab-

solute power to control and regulate passed with the title to the game and wild life to the several states, subject only to the applicable provisions of the Federal constitution. *Cawsey v. Brickey,* 82 Wash. 653, 144 Pac. 938; *Graves v. Dunlap,* 87 Wash. 648, 152 Pac. 532, Ann. Cas. 1917B, 944, L. R. A. 1916C, 338; *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101.

In 1904, the legislature of New York made an appropriation for the purpose of purchasing wild beavers to restock the Adirondacks. Four beavers were released in Eagle creek. One Barrett owned a valuable tract of water-front on Fourth lake, Eagle creek forming its rear boundary. The land was valuable for summer homes, and much of its attractiveness was due to its forest growth. In 1912, and during the two or three years previous thereto, the descendants of the original four beavers felled 198 poplars and girdled a number of others. Barrett sued the state for damages and was awarded $1,900. The appellate division sustained the decision of the lower court, but it was reversed by the court of appeals in *Barrett v. State,* 220 N. Y. 423, 116 N. E. 99, Ann. Cas. 1917D, 807, L. R. A. 1918C, 400. The court said, in part:

"To sustain it [the recovery] the respondents rely upon three propositions. It is said, *First,* that the state may not protect such an animal as the beaver which is known to be destructive; *second,* that the provision of the law of 1904 with regard to the molestation of beaver prohibits the claimants from protecting their property and is, therefore, an unreasonable exercise of the police power; and, *third,* that the state was in actual physical possession of the beaver placed on Eagle creek and that its act in freeing them, knowing their natural propensity to destroy trees, makes the state liable for the damage done by them.

"We cannot agree with either of these propositions."

The court, after stating that the ownership of wild animals was in the state in its sovereign capacity for the benefit of all the people, said:

"Wherever protection is accorded harm may be done to the individual. Deer or moose may browse on his crops; mink or skunks kill his chickens; robins eat his cherries. In certain cases the legislature may be mistaken in its belief that more good than harm is occasioned. But this is clearly a matter which is confided to its discretion. It exercises a governmental function for the benefit of the public at large and no one can complain of the incidental injuries that may result."

In discussing the police power of the state, with reference to the matter, the court said, in part:

"The police power is not to be limited to guarding merely the physical or material interests of the citizen. His moral, intellectual and spiritual needs may also be considered. The eagle is preserved, not for its use but for its beauty.

"The same thing may be said of the beaver. They are one of the most valuable of the fur-bearing animals of the state. They may be used for food. But apart from these considerations their habits and customs, their curious instincts and intelligence place them in a class by themselves. Observation of the animals at work or play is a source of never-failing interest and instruction. If they are to be preserved experience has taught us that protection is required. If they cause more damage than deer or moose, the degree of the mischief done by them is not so much greater or so different as to require the application of a special rule. If the preservation of the former does not unduly oppress individuals, neither does the latter.

"In the determination of what is a reasonable exercise of the powers of the government, the acts of other governments under similar circumstances have some bearing. In Wyoming, Utah, North Dakota, Wisconsin, Maine, Colorado and Vermont beaver are absolutely protected. In Michigan they are protected except between November 1st and May 15th of each year."

We have quoted from *Barrett v. State* at such length because it is one of the leading cases on the subject. It was quoted with approval in our opinion in *State v. Burk,* 114 Wash. 370, 195 Pac. 16, 21 A. L. R. 193, and very recently (1933) in *Maitland v. People,* 93 Colo. 59, 23 P. (2d) 116, wherein the plaintiff contended that, where a deer refuge or sanctuary was created by the state and the deer injured and destroyed his growing crops, the law was unconstitutional as violative of § 15, Art. II of the Colorado constitution, providing that private property shall not be taken or damaged for public or private use without compensation. The court squarely held that the act was not violative of the constitutional provision and went on to say:

"*Though it is not essential to the validity of the act in question that compensation should be paid for such injuries,* the General Assembly, in 1931, passed an act providing for the payment, out of the state game and fish fund, of claims for damages done to real or personal property 'by any wild animals protected by the game and fish laws of the state.' S. L. '31, c. 98. No doubt that will afford some relief to the defendant." (Italics ours.)

As shown by the above quotation, the state of Colorado has taken steps to mitigate the harsh rule laid down in the *Barrett* case to the effect that the state's duty to foster and protect its wild life permits it to use all private property in the state for the purpose of providing such wild life with suitable dens and dwellings without let or hindrance.

We have no law of the kind referred to in the quotation from the *Maitland* case, yet the appellants were not altogether without remedy in the premises. Unfortunately, they allowed themselves to be intimidated by the game commission and its employees. When the people, by initiative, established the present game code in 1933 (chapter 3, Laws of 1933, p. 24);

they expressly repealed many sections of the former game code (chapter 178, Laws of 1925, Ex. Ses., p. 494), but left § 61, p. 523, thereof (Rem. Rev. Stat., § 5920 [P. C. § 2640-6]) undisturbed. This section reads as follows:

"It shall be unlawful for any person to trap any fur-bearing animal between the first day of April and the fifteenth day of November in any year; provided, that it shall be lawful for the owner or occupant of any real property on which any crop is being grown or any domestic animals or fowl are being kept to trap any fur-bearing animal which is destroying or injuring any such crop, domestic animals, or fowl, or any *dike,* drain or irrigation ditch." (Italics ours.)

Furthermore, this court in 1921 held squarely, in the case of *State v. Burk,* 114 Wash. 370, 195 Pac. 16, 21 A. L. R. 193, that one has the constitutional right to defend and protect his property, against imminent and threatened injury by a protected animal, even to the extent of killing the animal, in that case an elk. We are not advised that the legislature has in any way sought to abrogate or modify the rule laid down in that case, or that it has attempted to give the game commission, or anyone else, the authority to prevent one from protecting his property under such circumstances. Under the facts shown by the appellants' pleadings in this case, there can be no doubt that they would have been justified in removing the animals in order to protect their business, and we think, under the facts and circumstances pleaded in their complaint, if that could not be successfully done, that they would have been justified in killing them.

The establishment of the game sanctuary was not the direct cause of the appellants' damage, but the failure to remove the animals. If it can be rightly said that the appellants were *prevented* from doing that— which is doubtful, since they chose to obey when they

. need not have done so—the answer is that they were not prevented by the state, which is the sole defendant in this case, but by members of the game commission and its employees acting beyond the scope of their authority.

In the exhaustive and comprehensive opinion written by Judge Ellis in the case of *Riddoch v. State,* 68 Wash. 329, 123 Pac. 450, Ann. Cas. 1913E, 1033, 42 L. R. A. (N. S.) 251, it is established beyond all doubt that the state of Washington is not liable for acts of negligence and misfeasance committed by its officers and agents, even when acting within the scope of their authority. That being true, it most certainly follows that the state is not liable for damages caused by acts committed by its officers and agents when acting in excess of their authority.

The judgment appealed from is affirmed.

STEINERT, C. J., MAIN, and BEALS, JJ., concur.

HOLCOMB, J. (concurring in the result)—Although I do not concur in some of the statements and reasons in this opinion supposed to have a bearing on the matter, since appellants have a remedy under Rem. Rev. Stat., § 5920 [P. C. § 2640-6], I concur in the result.