IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31078-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLAY MARTIN HULL, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, C.J. — Clay Martin Hull appeals his convictions of drive-by shooting

and animal cruelty in the first degree. He challenges the trial court's refusal to instruct

the jury on self-defense, the sufficiency of the evidence to sustain both means of

committing first degree animal cruelty on which the jury was instructed, and the trial

court's failure to recognize mitigating factors that he argues could support an exceptional

sentence.

Several decisions of our Supreme Court hold that the common law right to use

force in defense of property, subject to its common law limitations, is a constitutional

right. Because the constitutional underpinning of those decisions necessarily supports a

constitutional right to personal self-defense, Mr. Hull was entitled to have the jury

instructed on his right to self-defense to the extent that there was evidence to support it. As to the animal cruelty count, but not the drive-by shooting count, there was such evidence. We find no other error or abuse of discretion by the trial court.

We reverse Mr. Hull's conviction of animal cruelty, remand for a new trial on that count, and otherwise affirm.

## FACTS AND PROCEDURAL BACKGROUND

It is undisputed that Clay Hull fired at least seven shots from a semiautomatic pistol on a residential street in Yakima on a night in December 2010 and that his shots struck Dobie, a female Doberman Pinscher. As a result of his actions that evening, Mr. Hull was charged with drive-by shooting, first degree animal cruelty while armed with a firearm, and tampering with a witness. The principal dispute at his criminal trial was whether he was attacked by Dobie and fired the shots in reasonable self-defense.

At trial, Mr. Hull's version of events—supported by two of his friends, who claimed to have been following his car that evening—was that he was driving home from a concert with his girl friend, Laura Peterman, when he urgently needed to urinate and stopped his truck on a residential street. Mr. Hull testified that he suffers from a bladder condition that requires that he relieve himself immediately. When he stepped outside his truck, Mr. Hull claims to have seen a man briefly come outside a nearby house and look around before going back in. Not wanting to be seen, Mr. Hull got back into the truck and drove a little further down the street, stopping again where it was darker.

2

Mr. Hull testified that at the second stop, and as soon as he unzipped his pants, he was confronted by two barking dogs. According to him, a Doberman Pinscher showed its teeth, jumped on him, and came at him again when he tried to push it back. Mr. Hull has a concealed weapon permit and was carrying a semiautomatic pistol. He fired several shots at the dog in "rapid succession." Report of Proceedings (RP) at 936. When the dog turned and ran, he fired "one or two more." RP at 906.

Dobie was found, shot, inside the fenced yard of Ulysis and Minerva Perez. According to Mr. Hull, she must have jumped over the fence into the yard after he shot at her. Mr. Hull claims that the second dog barked and ran at him a few seconds later, and he fired multiple shots at that dog to scare it off.

Ms. Peterman was not nearly as supportive of Mr. Hull's version of events as were the two friends who claimed to have followed the couple in their car. She testified that she and Mr. Hull left the concert early because Mr. Hull had been kicked out. According to her, he was intoxicated and seemed frustrated. She claims that she and Mr. Hull left the concert alone and she never saw anyone following them.

As Mr. Hull was driving Ms. Peterman home, he apparently forgot that he was supposed to drop her off at her sister's house and drove toward her mother's home instead. When Ms. Peterman reminded him she was not staying with her mother, Mr. Hull stopped his truck on Adams Street, near her mother's home, telling her he "had to pee." RP at 578. Ms. Peterman agreed with Mr. Hull's testimony that when he first got

3

out of the truck someone came out of a home on the corner and Mr. Hull got back into the truck and drove further down the street before stopping again.

Before Mr. Hull stopped the truck the second time, Ms. Peterman testified that a German Shepherd that was often loose in that neighborhood ran toward the truck. She claims that she cautioned Mr. Hull about stopping at the second location because of the dog, but he stopped anyway and stepped behind the truck. A few seconds later, she heard gunshots. She never saw any other dogs and feared that Mr. Hull had shot the German Shepherd. She testified that when he got back into the vehicle, Mr. Hull told her he was "going to clean up the neighborhood that his son was going to be forced to grow up in"— an apparent reference to Ms. Peterman's near full term (36 week) pregnancy with Mr. Hull's son. RP at 580.

According to Ms. Peterman, Mr. Hull then drove erratically en route to her sister's house, missing turns and nearly getting in several accidents. When he dropped her off, she told him he needed to go home, to which he responded, "[W]e'll see about that, because your ex might be next." RP at 581. She construed the comment as referring to her ex-husband, with whom her two young children were staying that night.

Concerned about Mr. Hull's intoxication, actions, and statements, Ms. Peterman called 911 upon arriving at her sister's home. Her 911 call was played to the jury. Ms. Peterman provided Mr. Hull's license plate number, reported his drunk driving, his

4

statements, and her concern that he might have shot a dog. She asked that her report be treated as an "anonymous" one. RP at 593.

Police officers were dispatched to Mr. Hull's home, but he was not there. They told his younger brother that they wanted to speak with him. When Mr. Hull returned home and learned that police were looking for him, he contacted dispatch and offered to come into the station and provide a statement, which he later did. Between arriving home and traveling to the station, he contacted Ms. Peterman. According to him, it was to tell her to tell the truth. According to her, it was to ask her to tell police that a dog attacked him. She told him she did not see him get attacked by any dog. When Mr. Hull provided a statement to Yakima police later that evening, he told them that he had been alone when attacked by dogs and there were no witnesses.

Other witnesses at trial included residents of the homes on Adams Street: Shawn Moody, Minerva Perez, and Ulysis Perez. Based on testimony tied to photographs, Mr. Hull's first stop had been near Mr. Moody's home, while his second stop was near the fenced yard within which the extended Perez family had two homes.

Mr. Moody, the owner of the German Shepherd, testified that he looked outside on the night of the shooting when he heard his dog barking. He saw a man standing behind a pickup truck, urinating, and noticed a woman sitting in the passenger seat. He testified that he left his window and began watching the man on the video monitor for his

5

surveillance camera, which faces the street. The surveillance camera was not in a recording mode at the time.

From the video, Mr. Moody saw the man take off, drive a little further, stop, and get out again. According to Mr. Moody, the man walked aggressively back toward his house, prompting Mr. Moody to step out on his back porch. As he did, he claims the man, who was in the middle of the road, "open[ed] fire on my house." RP at 419. Mr. Moody testified that in response he "hit the ground," not knowing what the shooter was going to do. RP at 420. Once Mr. Hull stopped shooting in the direction of his home, Mr. Moody testified, "[h]e turned around, walked towards the truck and shot my neighbor's dog and then got in his truck and then took off." RP at 421. Mr. Moody never saw Dobie charge the shooter and testified that she had been in the fenced-in yard. Mr. Moody also testified that aside from Mr. Hull's truck, he never saw any other vehicles. Mr. Moody testified that he and his brother later found evidence that a bullet had grazed his house underneath his window, and found a bullet hole in the back of his truck.

The testimony of Minerva and Ulysis Perez established that the Perezes' yard is enclosed by a chain link fence that varies from four to six feet tall between the front and back, and surrounds both houses. Mr. Perez testified that he has two Dobermans; on the night of the shooting, his male Doberman was inside a dog run located in the backyard, and Dobie was in the fenced yard. Ms. Perez testified that she was in her living room

6

watching television when she heard Dobie barking, followed by the sound of gunshots. She did not realize how close the shots were and did not immediately get up to look outside; when she did go to the window, she saw a truck parked on the road near the fence. A man was standing outside the truck's door but got into the truck and sped away. It was only when Dobie came to her door that Ms. Perez realized the dog had been shot.

Officer Mark McKinney investigated the shooting. He found eight fired 9 millimeter shell casings in the middle of Adams Street, blood spatter inside the Perezes' yard, just inside the fence, and a portion of a bullet jacket located a few feet away. He observed damage to the fence where a bullet had apparently hit it. He found no evidence of blood along the street or anywhere outside of the fence.

The officer testified that Dobie had an entrance wound behind her right shoulder, and two wounds in the chest that appeared to be exit wounds. According to Mr. Perez, Dobie took two months to recover from her wounds and was still limping at the time of the trial in June 2012.

Mr. Hull asserted self-defense as to both the drive-by shooting and animal cruelty charges. The trial court refused to instruct the jury on self-defense, concluding that the self-defense statute, RCW 9A.16.020, did not extend to self-defense against an animal. The court instructed the jury instead on the defense of necessity. The necessity instructions placed the burden of proof on Mr. Hull to prove his actions were necessary to avoid a greater harm.

The jury acquitted Mr. Hull of the tampering with a witness charge, found him guilty of drive-by shooting and first degree animal cruelty, and returned a special verdict finding that he was armed with a firearm at the time he committed the animal cruelty offense. Mr. Hull's motion for a new trial was denied.

At sentencing, Mr. Hull's lawyer requested an exceptional sentence below the standard range. The trial court rejected the request, imposed a sentence of 21 months for the drive-by shooting (the low end of the standard range), and imposed a sentence of 30 days for the animal cruelty count, to run concurrently. It imposed an 18-month sentence for the firearm enhancement, to run consecutive to the balance of the sentence.

Mr. Hull appealed. Following his original notice of appeal, he moved to supplementally assign error to the court's imposition of a firearm enhancement to the animal cruelty charge in light of our intervening decision in *State v. Soto*, 177 Wn. App. 706, 309 P.3d 596 (2013), holding that a court lacks statutory authority to impose a firearm enhancement for an unranked offense. The State conceded error, and because Mr. Hull was close to completing his sentence but for the firearm enhancement, a commissioner of this court granted Mr. Hull's motion and accepted the State's concession. *See* Comm'r's Ruling at 2 (Dec. 16, 2013).[1]

---

[1] With our reversal of the animal cruelty conviction, the timely decision on that then-viable issue is rendered moot.

8

ANALYSIS

Mr. Hull assigns error to the trial court's refusal to give a self-defense instruction, to the sufficiency of the evidence to support the alternative means of animal cruelty relied upon by the State, and to the court's alleged refusal to consider an exceptional mitigated sentence. We address the assignments of error in turn.

*I. Refusal to instruct on a right to self-defense against an animal*

Mr. Hull asked the trial court to instruct the jury that a person has a right to use force in self-defense against an attacking animal, as a defense to both the drive-by shooting and the first degree animal cruelty charges. He adapted his proposed instruction from the pattern instruction on the statutory right to lawfully use force "upon or toward the person of another" when a person reasonably believes that he or she is about to be injured. *See* RCW 9A.16.020. Mr. Hull's proposed instruction would have substituted the following language for the second sentence of the pattern instruction provided at 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02 (3d ed. 2008).

> The Defendant has a constitutional right to self-defense when attacked by an animal. The use of force in defense of an animal attack is lawful when used by a person who reasonably believes that he is about to be injured by an animal attack, and when the force is not more than is necessary.

Clerk's Papers (CP) at 61, 62. As support for its proposed instruction, Mr. Hull cited *State v. Burk*, 114 Wash. 370, 195 P. 16 (1921).

9

The trial court refused to give the instruction. It accepted the State's argument that RCW 9A.16.020 identifies only circumstances where "[t]he use, attempt, or offer to use force upon or toward *the person of another*" is not unlawful (emphasis added); by its plain terms, the statute does not recognize the lawfulness of force used upon or toward an attacking animal. The court concluded that the common law defense of necessity was the appropriate standard for excusing a defendant's force used against an attacking animal since it is broad enough to encompass that risk of harm.[2]

Three Washington decisions relied upon by Mr. Hull state that the right to use force against an animal in protecting property is a constitutional right. One, in dicta, speaks of an equal or greater right to use force against an animal in self-defense. None of the three decisions identifies the constitutional provision on which the court relies. Having considered the three decisions and the several constitutional provisions on which the court might have been relying, we conclude that the constitutional provisions that

---

[2] As defined by the Washington pattern jury instruction given to the jury in this case, necessity is a defense to a crime if

(1) the defendant reasonably believed the commission of the crime was necessary to avoid or minimize a harm; and

(2) the harm sought to be avoided was greater than the harm resulting from a violation of the law; and

(3) the threatened harm was not brought about by the defendant; and

(4) no reasonable legal alternative existed.

CP at 87-88.

10

arguably support a constitutional right to protect property from animal attack support an equal or great right to self-defense.

*A. The constitution provisions that arguably support a constitutional right to protect property support an equal or greater constitutional right to self-defense*

The earliest case relied upon by Mr. Hull is *Burk*, a 1921 decision in which the Washington Supreme Court described a landowner's right to defend both property and life against animal attack, in constitutional terms. The defendant, Mr. Burk, was found to have killed two elk and been in the possession of their carcasses in violation of state game laws. His defense was that at the time of the killing, the elk were "in the act of damaging and destroying his crops." *Burk*, 114 Wash. at 371. Yet the criminal statute under which Mr. Burk was charged did not admit of any such defense.

The court in *Burk* recognized that the legislature had the right to pass laws to provide for the protection of animals. But it drew a line—and seemingly a constitutional line—at criminal laws that failed to recognize a right to defend life or property. It treated the proposition as self-evident:

> If in this case the appellant had undertaken to defend on the ground that he killed the elk for the protection of his life, or that of some member of his family, then, unquestionably, such defense would have been available. But *the constitutional right is to defend, not only one's life, but one's property.* The difference in the justification in killing a protected elk in defense of one's life and killing one in defense of one's property is only in degree. Undoubtedly, a stronger showing would have to be made by one undertaking to justify his violation of the law in defense of his property than he would be required to make in defense of his life.

11

*Id.* at 374 (emphasis added). The court further compared the right to defend one's

property to the right of self-defense, quoting the following reasoning from an Iowa case,

*State v. Ward*:

> "By way of analogy, . . . reasonable self-defense may always be interposed
> in justification of the killing of a human being. We see no fair reason for
> holding that the same plea may not be interposed in justification of the
> killing of a goat or a deer. The right of defense of person and property is a
> constitutional right, . . . and is recognized in the construction of all statutes.
> If in this case it was reasonably necessary for the defendant to kill the deer
> in question in order to prevent substantial injury to his property, such fact,
> we have no doubt, would afford justification for the killing."

*Id.* at 375 (quoting *Ward*, 170 Iowa 185, 152 N.W. 501, 502 (1915)).

Nowhere in its opinion did the *Burk* court identify which provision of the

Washington Constitution or federal constitution it viewed as applying.

In *Cook v. State*, 192 Wash. 602, 611, 74 P.2d 199 (1937), the court addressed an

inverse condemnation action by the operator of a commercial ice skating operation who

claimed that the state Game Commission had destroyed its business by prohibiting it

from trapping muskrats that burrowed through its dike and beavers that dammed the

creek feeding its pond. In concluding that the plaintiff should have stood by its rights and

defied the Game Commission, the Supreme Court pointed out that "this court in 1921

held squarely, in [*Burk*], that one has the constitutional right to defend and protect [its]

property, against imminent and threatened injury by a protected animal, even to the

extent of killing the animal." *Id.* As in *Burk*, it shed no light on the constitutional

12

provision that supported *Burk*'s, or its own holding. It did observe that it was not advised "that the Legislature has in any way sought to abrogate or modify the rule laid down in [*Burk*]." *Id.*

Finally, in *State v. Vander Houwen*, 163 Wn.2d 25, 33, 177 P.3d 93 (2008), the Supreme Court held that an owner charged with game violations for killing elk that were destroying its orchards was entitled to an instruction on his right to protect his property— what the court referred to as a "*Burk*" instruction—and that the instruction should have placed the burden of proof on the State to prove that the defendant was *not* protecting his property. As in *Burk* and *Cook*, the Supreme Court did not analyze the constitutional basis for the right to protect property against attack, although it disclosed that the defendant, at least, based his argument on the guarantee of due process provided by article I, section 3 of the Washington Constitution. *Id.* at 33. The decision in *Vander Houwen* reiterated the constitutional character of the right, stating that the holding in *Burk* "illustrates more than a common law principle; rather it recognizes 'a *constitutional right* to show, if [Mr. Vander Houwen] could, that it was reasonably necessary for him to kill these elk for the protection of his property.'" *Id.* at 33 (quoting *Burk*, 114 Wn.2d at 376). Elsewhere, the court said that the two instructions given in *Burk* continued to be "an accurate declaration of a property owner's constitutional right to kill protected game when 'reasonably necessary' to protect his property." *Id.* at 33-34.

13

In this case, the State successfully argued in the trial court and argues again on appeal that *Burk*, *Cook*, and *Vander Houwen* all dealt with protection of property and do not support a right to *personal* self-defense against an attacking animal, which it contends would be contrary to RCW 9A.16.020.[3] But the three arguable constitutional bases for *Burk* and its progeny each supports an equal if not greater constitutional right to personal self-defense. We conclude that the trial court erred in concluding that Mr. Hull was not entitled to assert a right of self-defense if there was evidence to support it.

      *1.    A retained right to self-defense under article I, section 30*

One basis for the constitutional right first articulated in *Burk* is suggested, indirectly, by the out-of-state authority on which the decision relies.

*Ward*, an Iowa case, was described by *Burk* as "directly [on] point," 114 Wash. at 374. It had held that "[t]he right of defense of person and property is a constitutional right . . . and is recognized in the construction of all statutes," relying on article I, section 1 of the Iowa Constitution. *Ward*, 170 Iowa at 502. That provision of the Iowa Constitution formerly provided that "[a]ll men . . . have certain inalienable rights—

---

[3] Although we decide this case on the constitutional grounds raised by Mr. Hull, we point out that a statute in derogation of the common law must be strictly construed and no intent to change that law will be found, unless it appears with clarity. *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 76-77, 169 P.3d 691 (2008). Applying that principle, RCW 9A.16.020 must be read as codifying those circumstances in which it is lawful to use force upon or toward another person. It does not purport to be a statement of all rights of self-defense and should not be construed as if it were.

among which are those of enjoying and *defending life and liberty*, [and] acquiring, possessing and *protecting property*."[4] (Emphasis added.)

*Burk* also relied on the "elaborate[ ] and learned[ ] discuss[ion]" in *Aldrich v. Wright*, 53 N.H. 398 (1873) for its conclusion that the right to self-defense was constitutionally guaranteed. *Aldrich*'s basis for the constitutional guaranty it recognized was article II of New Hampshire's bill of rights, which provides in relevant part that "[a]ll men have certain natural, essential, and inherent rights—among which are, the enjoying and *defending life and liberty*; [and] acquiring, possessing, and *protecting property*." *Id.* at 2 (emphasis added).

Washington's Constitution has no parallel provision explicitly recognizing "personal" or "natural" rights. It does, however, speak of the people's "retained" rights in general terms. It provides at article I, section 30 that "[t]he enumeration in this Constitution of certain rights shall not be construed to deny others retained by the people." WASH. CONST. art. I, § 30. "In simple terms, this section is a 'safeguard' and protects fundamental rights that the constitution might not mention." ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE, at 43 (2002). In *State v. Clark*, 30 Wash. 439, 444, 71 P. 20 (1902), our Supreme Court addressed article I, section 30, and explained why some rights were expressly enumerated

---

[4] The Iowa Constitution was amended in 1998 to insert "and women" after "[a]ll men."

15

in the constitution's declaration of rights while others, though equally important, were not:

> Those expressly declared were evidently such as the history and experience of our people had shown were most frequently invaded by arbitrary power, and they were defined and asserted affirmatively. Consistently with the affirmative declaration of such rights, it has been universally recognized by the profoundest jurists and statesmen that certain fundamental, inalienable rights under the laws of God and nature are immutable, and cannot be violated by any authority founded in right.

In considering whether the right to self-defense is a right retained by the people under article I, section 30, it is noteworthy that 21 states that chose to expressly identify "inalienable," "natural," or "inherent" rights in their state constitutions—among them, Iowa and New Hampshire—included the rights to defend life and liberty, and to protect property. *See* Eugene Volokh, *State Constitutional Rights of Self-Defense and Defense of Property*, 11 TEX. REV. L. & POL. 399, at 401-07 (2007) (reproducing state constitutional protections). As observed by Professor Volokh, "These formulations go back at least to Samuel Adams' *The Rights of the Colonists: The Report of Correspondence to the Boston Town Meeting*, Nov. 20, 1772, which began with very similar language, characterized by Adams as self-evidently true:

> Among the natural rights of the Colonists are these: First, a right to life; Secondly, to liberty; Thirdly, to property; together with the right to support and defend them in the best manner they can. These are evident branches of, rather than deductions from, the duty of self-preservation, commonly called the first law of nature."

16

*Id.* at 407).[5]

At least one author has characterized self-defense as something that "ought to be one of the first things protected under the Ninth Amendment [to the U.S. Constitution]"—the federal equivalent to Washington's article I, section 30.[6] Nicholas J. Johnson, *Self-Defense?*, 2 J.L. ECON. & POL'Y 187, 195 (2006). A Louisiana jurist has also suggested that the Ninth Amendment to the United States Constitution guarantees an individual's right to defend himself from violence. *State v. Heck*, 307 So. 2d 332, 335-36 (La. 1975) (Barham, J., dissenting).

If *Burk*, *Cook*, and *Vander Houwen* recognized the right to protect property as an historical "right retained by the people" under article I, section 30, then it follows from the historical evidence that the equally fundamental right to self-defense is a right retained under article I, section 30 as well.

 *2. Self-defense as a fundamental right guaranteed by due process*

A second possible basis for the constitutional right acknowledged by *Burk* and later cases is article I, section 3 of the Washington Constitution, the basis relied upon by the appellant in *Vander Houwen*. Article I, section 3 provides, "No person shall be deprived

---

 [5] Professor Volokh also cites writings of Blackstone, George Tucker (a leading early American commentator), and Thomas Cooley (a constitutional law commentator of the late 1800s) that characterize the right to self-defense as a natural right. *Id.* at 416.

 [6] The Ninth Amendment provides, "The enumeration in the [C]onstitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

of life, liberty, or property, without due process of law." While the Supreme Court's

opinion in *Vander Houwen* did not discuss the source of Mr. Vander Houwen's

constitutional right to protect his property, it does at one point refer to it as a

"fundamental right." *Vander Houwen*, 163 Wn.2d at 36.

As the United States Supreme Court has said of the due process clause of the

Fourteenth Amendment, "the Due Process Clause guarantees more than fair process, and

the 'liberty' it protects includes more than the absence of physical restraint. The Clause

also provides heightened protection against governmental interference with certain

fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 117

S. Ct. 2258, 138 L. Ed. 2d 772 (1997)[7] (citations omitted). In *Glucksberg*, the Supreme

Court described the two primary features of its established method of substantive-due-

process analysis:

> First, we have regularly observed that the Due Process Clause specially
> protects those fundamental rights and liberties which are, objectively,
> "deeply rooted in this Nation's history and tradition," and "implicit in the
> concept of ordered liberty," such that "neither liberty nor justice would exist
> if they were sacrificed." Second, we have required in substantive-due-
> process cases a "careful description" of the asserted fundamental liberty
> interest. Our Nation's history, legal traditions, and practices thus provide
> the crucial "guideposts for responsible decisionmaking," that direct and
> restrain our exposition of the Due Process Clause.

---

[7] Due process challenges ordinarily do not require separate analysis under the state
and federal constitutions. *Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 7 n.7,
256 P.3d 339 (2011). We have not identified any relevant Washington authority.

*Id.* at 720-21 (citations omitted) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion); *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 82 L. Ed. 288 (1937); *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993); *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)).

A handful of decisions have considered whether a right to protect property or to self-defense are matters guaranteed by due process.

In *Christy v. Hodel*, 857 F.2d 1324 (9th Cir. 1988), the Ninth Circuit Court of Appeals refused to recognize a constitutional right to protect property from animal attack. The plaintiffs were sheep ranchers who challenged the constitutionality of the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531-1544, and regulations under the act, insofar as the act and regulations prohibited them from killing the grizzly bears that killed their sheep. The plaintiffs asserted a fundamental due process right to protect property. The district court had rejected the existence of a constitutional right, evaluated the act and regulations under the "rational basis" test, and found that they satisfied the test.

The Ninth Circuit noted that "[c]ertain state courts have construed their own constitutions to protect the sort of right claimed by the plaintiffs in this case," citing decisions from Wyoming and Montana. 857 F.2d at 1329. But it observed that no court had construed the United States Constitution as recognizing such a right. In affirming the

19

district court, it pointed out that the 10th Circuit, having observed that the ESA includes an exemption for *personal* self-defense but not defense of property, opined that the omission of a right to protect property "evinces a congressional view that no such right exists under the United States Constitution." *Id.* (citing *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1428 n.8 (10th Cir. 1986) (en banc)).

A due process right to self-defense has fared more successfully, in a few courts. In *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002), the Sixth Circuit Court of Appeals held that "the right of a defendant in a criminal trial to assert self-defense is [a] fundamental right[ ], and [the] failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause." It noted that "[o]ther Courts of Appeals have already reached the same conclusion." *Id.* at 852 (citing *Sloan v. Gramley*, 215 F.3d 1330 (7th Cir. 2000); *Clemmons v. Delo*, 177 F.3d 680, 685 (8th Cir. 1999)).

The same result was reached in a very early West Virginia case, *State v. Workman*, 35 W. Va. 367, 14 S.E. 9 (1891), *adhered to in State v. Buckner*, 377 S.E.2d 139, 142-43, (W. Va. 1988). *Workman* found that a constitutional right to self-defense was guaranteed by both the due process clause of the Fourteenth Amendment to the United States Constitution and article III, section 1 of the West Virginia Constitution.

Finally, the four-member plurality in *Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996), authored by Justice Scalia, appeared to view sympathetically the possibility that a right to self-defense is fundamental. *Egelhoff* reversed the Montana Supreme Court, which had held that instructing a jury that it could not consider a defendant's intoxicated condition in determining his mental state violated the defendant's right to due process. Justice Scalia's lead opinion held that the defendant failed to show that a right to have jurors consider voluntary intoxication was a fundamental principle of justice.

In an earlier decision, *Martin v. Ohio*, 480 U.S. 228, 107 S. Ct. 1098, 94 L. Ed. 2d 267 (1987) the United States Supreme Court had suggested it would be problematic if a jury weighing the State's proof in a murder case was instructed that *self-defense* evidence could not be considered. In explaining why the Montana court placed unwarranted reliance on that passage from *Martin*, Justice Scalia observed:

> This passage [from *Martin*] can be explained in various ways—*e.g.*, as an assertion that *the right to have a jury consider self-defense evidence* (unlike the right to have a jury consider evidence of voluntary intoxication) is *fundamental, a proposition that the historical record may support.*

*Egelhoff*, 518 U.S. at 56 (emphasis added).

The foregoing authority suggests that if article I, section 3's guarantee of due process is the basis for *Burk*, *Cook*, and *Vander Houwen*, it would provide an even more solid basis for a fundamental right of self-defense.

21

3. *Self-defense as a component of the right to bear arms under article 1, Section 24*

Mr. Hull places his principal reliance for the proposition that the right to act in self-defense is constitutionally guaranteed on article I, section 24 of the Washington Constitution and recent jurisprudence addressing the Second Amendment to the United States Constitution. Article 1, section 24 of the Washington Constitution provides in relevant part that "[t]he right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired."

In *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), the United States Supreme Court decided for the first time that the Second Amendment to the United States Constitution protects an individual right to keep and bear arms. Justice Scalia's opinion for the majority set forth a detailed historical argument that concern for the right to *individual self-defense* was the most important and longstanding basis on which the right to bear arms was regarded as fundamental. He cited Blackstone, among many others:

> By the time of the founding, the right to have arms had become fundamental for English subjects. Blackstone, whose works, we have said "constituted the preeminent authority on English law for the founding generation," cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. His description of it cannot possibly be thought to tie it to militia or military service. It was, he said, *"the natural right of resistance and self-preservation,"* and *"the right of having and using arms for self-preservation and defence."*

22

554 U.S. at 593-94 (emphasis added) (citations omitted) (quoting *Alden v. Maine*, 527 U.S. 706, 715, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999); 1 WILLIAM BLACKSTONE, COMMENTARIES *136, *139-40). The opinion explained why the absence of a textual reference to self-defense in the Second Amendment was unimportant:

> The debate with respect to the right to keep and bear arms, as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution. During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric. . . .
>
> It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; *most undoubtedly thought it even more important for self-defense and hunting.* But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.

*Id.* at 598-99 (emphasis added). The majority opinion also observed that the fact that seven of nine state constitutional protections for the right to bear arms enacted immediately after 1789, unequivocally protected an individual citizen's right to self-defense was "strong evidence that that is how the founding generation conceived of the right." *Id.* at 603.

In *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010), the Court held that the Second Amendment right applies to the States by virtue of the Fourteenth Amendment. It reiterated that "[s]elf-defense is a basic right,

23

recognized by many legal systems from ancient times to the present day, and the *Heller* Court held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 744 (quoting *Heller*, 554 U.S. at 599).

By their plain language, article I, section 24 of the Washington Constitution and the Second Amendment to the United States Constitution guarantee only a right to bear arms; they do not themselves guarantee a right to self-defense. We conclude that they are most reasonably read not as *creating* a right of self-defense but as lending support to the existence of an unenumerated right to self-defense retained by the people or fundamental to due process. Others have read constitutional guarantees of a right to bear arms as implicitly guaranteeing a right to self-defense, however. As observed in *Town of Canton v. Madden*, 120 Mo. App. 404, 96 S.W. 699, 700 (1906):

> "[I]f the citizen has reserved to himself the right to bear arms in defense of
> his home, person or property, he also has reserved the right to effectuate
> that privilege by employing such arms under the established limitations of
> the law, when a proper occasion presents itself and renders such
> employment imperative in order to give life and vigor to this natural right,
> for the right to bear arms in defense of one's property, his home or his
> person, would amount to naught if the right to use such arms, under proper
> circumstances, were denied.

Under any of these three possible sources of the constitutional right recognized in *Burk, Cook, and Vander Houwen*, it is clear that the right to individual self-defense enjoys equal or more support than the right to protection of property. It follows that the

24

common law right to self-defense, subject to its common law limitations, is a right guaranteed by the Washington Constitution.

*B. Was there sufficient evidence to submit the defense to the jury?*

"A criminal defendant is entitled to an instruction on his or her theory of the case if the evidence supports the instruction." *State v. Werner*, 170 Wn.2d 333, 336, 241 P.3d 410 (2010). In proceedings below, the State objected to the trial court's giving self-defense instructions not only because it believed there was no right to self-defense against an attacking animal but for the additional reason that the evidence did not support giving the instruction. It argued that Mr. Hull's testimony that he was in fear, without more, was not sufficient to establish the appearance of imminent danger required to justify deadly force, citing *State v. Walker*, 40 Wn. App. 658, 662, 700 P.2d 1168 (1985) (defendant's testimony that her husband was angry and, knowing him well, she justifiably believed that she was in serious danger, fell "woefully short of establishing an issue of justifiable self-defense.").

To determine whether a defendant is entitled to an instruction on self-defense, "the trial court must view the evidence from the standpoint of a reasonably prudent person who knows all the defendant knows and sees all the defendant sees." *State v. Read*, 147 Wn.2d 238, 242, 53 P.3d 26 (2002). A defendant bears the initial burden of pointing to evidence showing that he "had a good faith belief in the necessity of force and that that

belief was objectively reasonable." *State v. Dyson*, 90 Wn. App. 433, 438-39, 952 P.2d 1097 (1997).

Where *deadly force* is used in self-defense, the defendant must be able to point to evidence that his belief that such force was necessary was objectively reasonable. *State v. Walker*, 136 Wn.2d 767, 773, 966 P.2d 883 (1998). If the trial court finds no reasonable person in the defendant's shoes could have perceived a threat of great bodily harm, then the court does not have to instruct the jury on self-defense. *Id.*

Mr. Hull testified that the shots he first fired were at a dog that attacked him from the fenced area in front of the Perez home. He testified that after he unzipped his pants

> right then I heard barking and saw teeth. And I got my hands up, immediately got my hands up, pushed back, uhm, and I even had marks on my arms through—I was wearing a thick Carhartt coat and I still had a skid from a dog's paw through the thick Carhartt coat, and then it had ripped my cuticle back.
> I pushed it back, hoping it'd just back up. It didn't. It bounced rebound and came at me again. At that point in time I immediately pulled and pop, pop, pop. And it turned and took off and I believe I fired one or two more.

RP at 906. Mr. Hull testified that after he fired the shots, the Doberman that had jumped him headed "directly back towards that yard and it—it had to have gone back over the fence." RP at 908.

Mr. Hull conceded that he fired a second round of shots that he described at trial:

> [T]he other dog came at me within seconds of just, let's see, right here. Just immediately and it came from the front of my vehicle. As I was coming around to assess the situation, that dog was gone and I hear the bark

26

and I'm like, I don't think so, just go pop, pop, you know, get him just to go away. I didn't want to hurt it or anything like that. I just—leave me alone, I've had enough. And it turned around and left. And I mean, it took off.

RP at 907-08.

Mr. Hull was unfamiliar with the two dogs that he claimed attacked him, so he had no basis for believing that they were uniquely dangerous. His only injury was a ripped cuticle. The complete surprise of the initial attack, as he describes it, could have made it more difficult to immediately make a reasonable assessment of the danger. But once that instant of surprise had passed, Mr. Hull had no reasonable basis for believing that two barking, running dogs presented imminent danger of great bodily harm. In fact, his testimony that he felt no need to hurt the dogs but just wanted to get them to "go away" essentially concedes that he was not in great peril. Continuing to fire a semiautomatic pistol four more times in a residential neighborhood was unnecessary and unreasonable.

Because the trial court believed that Mr. Hull was not entitled to a self-defense instruction for legal reasons, it did not address whether the evidence supported giving self-defense instructions. Viewing the evidence in the light most favorable to Mr. Hull, and allowing for the possibility that Dobie was hit by one of the first three shots fired, the trial court might have concluded that there was enough evidence to instruct the jury on self-defense to the animal cruelty charge. We therefore reverse Mr. Hull's conviction on that charge and remand for a new trial.

27

Because we conclude that the remaining four shots that Mr. Hull admits firing were an objectively unreasonable response to all that he knew and saw, and that he was not entitled to have the jury instructed on self-defense in connection with the drive-by shooting charge, any error by the trial court in failing to consider whether the evidence supported giving a self-defense instruction in connection with that charge was necessarily harmless beyond a reasonable doubt.

## II.    *Sufficient evidence of animal cruelty*

Because we are reversing and remanding Mr. Hull's conviction of animal cruelty, we will only briefly address his argument that the evidence was insufficient to prove that he committed first degree animal cruelty by the alternative means of "intentionally inflict[ing] substantial pain on an animal," as provided by RCW 16.52.025(1)(a). Mr. Hull argues,

> The prosecution did not offer veterinary testimony about the nature and extent of injury. . . . No one testified about the degree to which the dog would perceive pain. No one explained whether a dog's perception of pain would be the same as a human's perception of pain.

Br. of Appellant at 20-21. Absent such evidence or expert testimony, Mr. Hull argues that "it is pure speculation for the jury to infer that the dog felt substantial pain." *Id.* at 21.

If there is an epistemological question to be answered as to whether animals perceive pain in a way that humans can understand and appreciate, the legislature has

28

answered it for our purposes by enacting a statute criminalizing animal cruelty. Many, if not most jurors have had interactions with domestic pets or other animals; others may have gained knowledge through education. In animal cruelty cases, as in cases involving personal injury to humans, jurors will often be able to determine whether an animal suffered substantial pain from the nature of the animal's injury, without the need for expert testimony. *See State v. Peterson*, 174 Wn. App. 828, 855, 301 P.3d 1060, *review denied*, 178 Wn.2d 1021 (2013) (whether horses suffered pain and suffering from dehydration "is a matter of common knowledge and ordinary experience"). In any retrial, the issue of whether Dobie suffered substantial pain from being shot through the shoulder and limping through a several months' long recovery qualifies as a matter the jury can determine without the need for expert testimony. "'[A] juror is expected to bring his or her opinions, insights, common sense, and everyday life experiences into deliberations.'" *Id.* (quoting *State v. Carlson*, 61 Wn. App. 865, 878, 812 P.2d 536 (1991)).

### III.    *Abuse of sentencing discretion*

Finally, Mr. Hull argues that he presented evidence of mitigating factors on the basis of which the court could have imposed an exceptional downward sentence, but that the court failed to recognize its discretion.

A defendant generally cannot appeal a standard range sentence such as the sentence imposed on Mr. Hull. RCW 9.94A.585(1); *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). He can appeal a failure by the sentencing court "to comply

with procedural requirements of the [Sentencing Reform Act of 1981, chapter 9.94A RCW,] or constitutional requirements." *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006); RCW 9.94A.585(2). Where a defendant appeals a sentencing court's denial of his request for an exceptional sentence below the standard range, "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). "A court refuses to exercise its discretion if it refuses categorically to impose an exceptional sentence below the standard range under any circumstances; i.e., it takes the position that it will never impose a sentence below the standard range." *Id.* "The failure to consider an exceptional sentence is reversible error." *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005).

Under RCW 9.94A.535(1), a court may impose an exceptional sentence below the standard range "if it finds that mitigating circumstances are established by a preponderance of the evidence." Unlike aggravating factors, for which the statutory list is exclusive, the list for mitigating factors is only illustrative. RCW 9.94A.535(1).

Mr. Hull claims that his belief that he was acting in reasonable self-defense, even if mistaken, was viable grounds for an exceptional sentence. It is clear from the record that the court rejected this as a basis for mitigating the sentence for drive-by shooting, since "the person who was the victim of the Drive-by conviction is not the dog, it's the

30

man who was in the home." RP at 1114-15. Mr. Hull urges this failed self-defense factor only as a basis for mitigating his sentence for animal cruelty. Since we are reversing that conviction, we need not address this proposed mitigating factor further.

Mr. Hull also asked the trial court to consider evidence of his cognitive impairment as grounds for an exceptional sentence. RCW 9.94A.535(1)(e) authorizes an exceptional sentence below the standard range if a preponderance of evidence shows that

> [t]he defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded.

In explaining why it would not impose an exceptional sentence, the court mentioned this statutory factor but found that Mr. Hull's capacity to appreciate the wrongfulness of his conduct was not significantly impaired.

According to Mr. Hull, because the statutory mitigation factors are not exclusive, the trial court erred in limiting itself to RCW 9.94A.535(1)(e)'s standard for cognitive impairment. He argues that the court should have considered his alternative, cognitive impairment standard—that the trauma to which he had been subjected "significantly impaired his capacity to react other than by force." Br. of Appellant at 26.

In announcing why it would not impose an exceptional sentence, the trial court began by stating that "[t]he[ ] legislature says the following [statutory factors] are illustrative, not intended to be exclusive reasons," clearly signaling that it recognized its discretion. RP at 1114. The court's statement that Mr. Hull had not shown that his brain

31

injury impaired his capacity to conform his conduct to the requirements of the law was, in our view, directly responsive to, and a rejection of, Mr. Hull's claim that he had shown an inability to react other than by force. Mr. Hull has not demonstrated that the court was confused or mistaken about its discretion.

We reverse Mr. Hull's conviction of animal cruelty and remand for resentencing and retrial of that count. We otherwise affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

I CONCUR:

Result only

Korsmo, J.

32

No. 31078-7-III

Brown, J. (concurring in result) — Notwithstanding the excellent scholarship in the lead opinion, I concur in the result for three reasons. First, the right to defend person and property against animals recognized in *State v. Burk*, 114 Wash. 370, 195 P. 16 (1921) is best described as an inherent right of constitutional magnitude retained by the people. Article I, section 30 of the Washington Constitution provides: "The enumeration in the Constitution of certain rights shall not be construed to deny others retained by the people." Whether to apply developed constitutional criminal due process principles and standards to inherent rights is an open, undeveloped question.

Second, while Clay Hull was fairly able to argue his defense theory under the court's necessity instruction, the jury was not clearly informed the State had the ultimate burden of proving the absence of necessity. Burden shifting involves due process of law. The Fifth Amendment and article I, section 3 similarly provide for "due process of law" when persons are challenged in cases involving "life, liberty or property" in our courts. But for the burden shifting problem, any instructional error would have been harmless because Mr. Hull's self-defense theory was fairly understood as necessity.

Third, Mr. Hull was charged with animal cruelty, not a firearm violation. In my view, Mr. Hull's "right" discussed in *Burk*, is not derived from the Second Amendment.

I cannot join in the lead opinion's analysis of the Second Amendment as a possible basis for declaring Mr. Hull's right of self-defense against animal attack.

Brown, J.

_____
Brown, J.